

225 BROADWAY
SUITE 715
NEW YORK, NY 10007
T: 212 323 6922
F: 212 323 6923

December 8, 2019

**VIA ECF**

The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:    United States of America v. Ryan Rainford
       18 Cr. 289 (SHS)

Dear Judge Stein:

There are four fundamental truths in the case of Ryan Rainford. Mr. Rainford was forced to take on the responsibility of being the "man of the house" when he was as young as eight years old. He has always placed the needs of others before his own. Second, Mr. Rainford has always sought and maintained employment, sometimes working several jobs so that he could support his family and children. One of his jobs led to his involvement with Peter Kalkanis, the leader of a slip-and-fall fraud scheme. Third, Mr. Rainford was convicted for his role wherein he participated in Kalkanis' scheme by transporting people who were themselves, Kalkanis' co-conspirators. While Kalkanis and the leaders of the scheme made millions of dollars, Mr. Rainford was paid a few thousand dollars for his role as driver for during a five-year period. Fourth, the jury was unable to reach a verdict on several counts, indicating through notes that they believed that the Government had

supplied insufficient evidence of the crimes.  Ultimately, the jury was "hung" on those counts and the Government ultimately decided to dismiss the counts related to mail fraud and wire fraud.  It is at the intersection of these four fundamental truths that this Court must craft a sentence that is "sufficient, but not greater than necessary."  18 U.S.C. 3553(a)(1).  For the reasons set forth more fully below, the defense would request a sentence of probation or home confinement with a period of supervised release.

## BACKGROUND

Hardworking.  Diligent. Responsible. Selfless. Dedicated.  These are just some of the words that Ryan Rainford's family and friends use to describe him.  He is known as someone who is always willing to help others and who puts his loved one's needs before his own.  Despite the pressure that came with being the man of the house after Mr. Rainford's parents separated, Mr. Rainford never let the pressure get to him and has continued to make a concerted effort to be a responsible and compassionate member of his family.

Ryan Rainford was born on May 27, 1989 in Brooklyn, New York.  PSR ¶ 69.  He and his siblings were initially raised in a household with both his parents, however, when Mr. Rainford was approximately eight years old, his parents separated.  PSR ¶ 71.  Mr. Rainford lived with his mother but continued to have regular contact with his father.  *Id*.  After his parents' separation, Mr. Rainford, his mother, and his siblings shared a residence with his grandmother, aunts, uncles, and cousins.  *Id*.  He quickly took on the role of "man of the house" for his mother and siblings and assumed "responsibility for his younger siblings maintaining discipline while his mother worked."  Exhibit A – Letter from Annette M. Rainford.  Mr. Rainford remembers the home being crowded, but his grandmother also took control and made sure the children went to school every

day and attended church every Sunday.  PSR ¶ 71.  Although he was forced to take on responsibility at a young age, Mr. Rainford has never complained or protested his role.  He loves being around his family and would do anything for them.  *See* Exhibit B – Letter from Colette Francis.  In addition to taking on the role of father figure to his immediate family, Mr. Rainford similarly acted as a father figure to his younger cousin, Jessica Foster, who lost her father at an early age to gun violence.  Exhibit C – Letter from Jessica Foster.  He taught her how to ride her first tricycle and also "the importance of being a strong and independent woman."  *Id*.

When Mr. Rainford was 17 years old, he, his siblings, and his mother moved into their own residence after the family lost their house.  *Id*.  The family was sued by an individual who was bitten by the family's dog and they could no longer afford the home.  *Id*.  Despite this loss, Mr. Rainford's needs were always met when he was growing up.  He continued to attend school regularly and thoroughly enjoyed his classes, especially math and art.  PSR ¶ 72.  Mr. Rainford also played soccer for his high school team.  *Id*.  He had been playing in his local neighborhood league since he was seven years old and enjoyed being active while also being a member of a team. *Id*.  When he was old enough, Mr. Rainford coached the young members of the community soccer team.  Exhibit C – Letter from Jessica Foster.  He exhibited "patience and the ability to explain and demonstrate strategy clearly" which made him an outstanding coach to the young players, many of whom looked up to him.  *Id*.  Since having children of his own, Mr. Rainford has been teaching them to play soccer in the backyard whenever he can.  Exhibit D – Letter from Jessica Gonzales.

Mr. Rainford graduated Benjamin Cardozo high school in June 2008.  PSR ¶ 84. Throughout high school, Mr. Rainford worked as a supervisor at a McDonald's restaurant in John F. Kennedy Airport in order to earn money.  *Id.*  After taking some time off to work and save

3

money for his continued education, Mr. Rainford attended Lincoln Technical School in Whitestone, New York in approximately 2011 where he studied automotive technology. PSR ¶ 85. Unfortunately, he did not complete his studies because he was unable to pay tuition. *Id*. However, he continued to have an interest in cars and obtained a commercial driver's license. PSR ¶ 86.

Mr. Rainford has worked with cars in many different capacities – as an Uber driver, a driver for a medical facility and a law office, and most recently as a school bus driver for Jofaz Transportation. PSR ¶¶ 88-91. Recently, Mr. Rainford has obtained a second job on the weekends as a driver of chartered coach buses for a company named Regency Transportation, LTD. (ECF 221). Mr. Rainford works on Saturday and Sunday from 7:00 am to 9:30 pm. *Id*. He reports to a garage where he obtains his bus for his assigned route. *Id*. The garage is located at 38 Southern Blvd., Nesconset, NY 11767. *Id*.

As a school bus driver, Mr. Rainford transports children with special needs to and from school. Exhibit A – Letter from Annette M. Rainford; Exhibit E – Letter from Ann-Marie Jones. In this position, he has "demonstrated a sense of responsibility [through] his patience, compassion and understanding" when transporting children with special needs. Exhibit A – Letter from Annette M. Rainford. It has also shown him "how much he has to be grateful for…" Exhibit E – Letter from Ann-Marie Jones. Mr. Rainford desires to complete his degree in automotive technology and obtain a Class A commercial license to better provide for his family. Exhibit A – Letter from Annette M. Rainford; *see also* Exhibit F – Letter from Sean Metellus. Throughout his life, Mr. Rainford has worked hard and planned his future for "the betterment of his family." Exhibit F – Letter from Sean Metellus.

Mr. Rainford is currently in a relationship with Jessica Gonzales and they have two children together.  PSR ¶ 74.  He also has an older son from a previous relationship and they have all come together to form a large and happy family.  PSR ¶ 73.  Mr. Rainford takes his role as a father very seriously and is dedicated to being an active presence is his children's lives.  He is both a best friend to his sons as well as a strong guiding hand.  *See* Exhibit G – Letter from Justin Gonzales. Whether they are playing in the backyard or simply having a family dinner, Mr. Rainford always wants to be around his children and wants to "discipline them, to guide them, to protect them, and most of all just to love them."  Exhibit D – Letter from Jessica Gonzales.  "The bonds and stability Ryan is building with his sons [are] the kind of foundation young boys need to be successful later in life."  Exhibit G – Letter from Justin Gonzales.

Since 2018, Mr. Rainford's father has been in and out of hospitals and inpatient rehabilitation.  PSR ¶ 69.  He has a thyroid condition which causes him to have brittle bones.  *Id*. At just 53 years old, his spinal cord has collapsed as a result of this condition.  *Id*.  Mr. Rainford visits his father every week to check in and spend time with him.  Exhibit H – Letter from Renelle Rainford.  Although Mr. Rainford works long hours, he always makes time to see his father. Exhibit A – Letter from Annette M. Rainford.  Additionally, Ms. Gonzales' father suffers from Alzheimer's and Mr. Rainford assists the family in caring for him.  He stops by the Gonzales' house daily after work to help bathe Mr. Gonzales and provide any additional assistance that is needed. Exhibit I – Letter from Helen Gonzales; *see also* Exhibit X – Letter from Jessica Gonzales; Exhibit E – Letter from Ann-Marie Jones; Exhibit J – Letter from Martin Gonzales.  When Mr. Gonzales falls, Mr. Rainford does not hesitate to run over and help pick him up and make sure he is okay.  *Id*.  Not only does Mr. Rainford help with the chores and taking care of Mr. Gonzales, he also makes sure to spend time with him, despite how challenging it can be dealing with someone

with Alzheimer's. "No matter how many times he would hear the same story, Ryan made [Mr. Gonzales] feel as if it was the first time hearing it." Exhibit G – Letter from Justin Gonzales. Mr. Rainford's mother suffers from hypertension and anxiety but has continued to work as a dietician supervisor in a nursing home. *Id.*

Mr. Rainford is a loving and supportive father, a devoted son to both his parents and his girlfriend's parents, and is always willing to lend a hand to anyone in need. He has a strong support system in his family and friends and has realized that all he has worked for can be taken away from him in the blink of an eye. Exhibit D – Letter from Jessica Gonzales. Mr. Rainford is determined to be in his children's lives and wants to continue his education so that he can continue to provide for his family.

## THE APPROPRIATE SENTENCE

## OBJECTIONS TO THE PSR

**Impact of the loss table and victims table in calculating the offense level should be limited.**

Too often, the loss table and victims table overstate the seriousness of the offense as well as the culpability of the offender, and do not serve the purpose of general of specific deterrence. In fact, an examination of the sentencing data for sentences imposed under § 2B1.1 shows that the guideline does a poor job of capturing offense seriousness or offender culpability – only 55% of §2B1.1 sentences were within the range in Fiscal Year 2011. USSC, *Preliminary Quarterly Data Report: 4th Quarter Release, Preliminary Fiscal Year 2011 Data Through October 31, 2011*, tbl. 5 (2011). There is a high rate of below-range sentences imposed under §2B1 – the rate of non-government sponsored below-range sentences was 23.5%, compared to an overall non-government-sponsored below-range rate of 17.2%. *Id.*

6

In Fiscal Year 2010, the majority of offenders falling within the 0-, 2-, and 4- level increases on the loss table were sentenced within the guideline range - 86.9%, 80.7%, and 70%, respectively.  Offenders who received a 6-level adjustment or higher were sentenced within the range less than 50% of the time and sometimes closer to 33% of the time.  *Id*. at tbl. 18.  As to non-government-sponsored below-range sentences, the data show an overall rate of 23%, with the fewest non-government-sponsored below-range sentences at levels 0, 2, and 4 of the loss table (6.7%, 11.8%, and 17.3% respectively), and the most non-government-sponsored below-range sentences at levels 6, 8, 10, 12, 26, and 30 (33.6%, 34.6%, 34.1%. 31.3%, 33.3%. 30.8%, respectively).

While other factors may influence the decline in the rates of within guidelines sentences after the 4-level increase under the loss table, the data suggest that the loss table bears no meaningful connection to offense seriousness or offender culpability.  Judges and prosecutors are finding that in many cases, §2B1.1 produces sentences that are too severe for non-violent offenders who typically present a low risk of recidivism.  Further, the defense submits that the Court should take into consideration that the people that the PSR lists as victims were, in reality, co-conspirators and in some cases, were more culpable for the criminal conduct than Mr. Rainford.

**Current loss calculations overstate the seriousness of the offense and culpability of the offender in many different kinds of fraud cases.**

Although the loss table is a cornerstone of §2B1.1, it should have less influence on the recommended guideline range than it does.  In many cases, loss "is a kind of accident" and thus "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004).  Numerous courts recognize this flaw with the loss table.  *See, e.g., United States v. Lauersen*, 362 F.3d 160, 164-65 (2d Cir. 2004), vacated on other grounds, 543 U.S. 1097 (2005); *United States v. Mueffelman*, 400 F. Supp.

2d 368, 372 (D. Mass. 2005) (same), aff'd, 470 F.3d 33 (1st Cir. 2006); *United States v. Watt*, 707 F. Supp. 2d 149, 155 (D. Mass. 2010) (sometimes loss is an effective "proxy for evaluating culpability," "sometimes it is not"); *United States v. Faulkenberry*, 759 F. Supp. 2d 915, 928 (S.D. Ohio 2010) ) ("As has become common among district courts sentencing white-collar offenders in financial fraud cases, the Court finds that the loss calculation substantially overstates the gravity of the offense here and declines to impose a within-Guidelines sentence."), aff'd, 461 Fed. Appx. 496 (6th Cir.2012), *certiorari denied* 568 U.S. 874 (2012).

Intended loss calculations, in combination with the relevant conduct rules, can be particularly unfair, increasing loss amounts well beyond the actual loss or the culpability of the defendant. The guidelines use intended loss when it is greater than the actual loss. By definition, this means a loss that never happened. On top of the loss intended by the defendant, the relevant conduct guideline sweeps within the loss calculation the reasonably foreseeable intended loss of others in jointly undertaken activity. Thus, a defendant who subjectively intends a lesser amount of loss may be held accountable for a substantially greater amount intended by co-conspirators if that greater amount is reasonably foreseeable. *United States v. Sliman*, 449 F.3d 797, 803 (7th Cir. 2006) (defendant who subjectively intended loss amount of $4 million in counterfeit checks was held responsible for $26 million in intended loss). The guidelines have "never endorsed sentencing based on the worse-case scenario potential loss." *United States v. Kopp*, 951 F.2d 521, 529 (3d Cir. 1991).

Special rules on calculating loss can drive up loss calculations to levels that overstate the seriousness of the offense. The commentary to §2B1.1(3)(F) contains several special rules for calculating loss that have the effect of increasing loss amounts in ways that are disproportionate to the culpability of the defendant or the harm caused by the offense. Due to the loss tables, intended

8

loss, and special rules on calculating loss ratchet up sentences unnecessarily and often overstate the seriousness of the offense, the culpability of the offender, and the need to deter future criminal conduct, the impact of the loss table should be limited.

Defendants whose personal gain was substantially less that the loss amount should be afforded lower sentences. As early as 1994, the Third Circuit recognized that the loss table "may well overstate both the degree of [a defendant's] criminality and his need to be corrected," where the loss exceeded the defendant's gain. *United States v. Stuart*, 22 F.3d 76, 82 (3d Cir. 1994) (loss table called for 9-level enhancement for $129,000 loss, but defendant received only $2,000). In the instant case, the testimony at trial established that Kalkanis, the doctors, lawyers and funders made millions while Mr. Rainford was paid for delivering clients and transporting packages.

Other courts have noted the same problem with the loss table. *See, e.g., United States v. Forchette*, 220 F. Supp. 2d 914, 925-31 (E.D. Wis. 2002) (departing downward where loss was $454,300, but gain was between $20,000 and 40,000). The fact remains that some defendants commit offenses to retain a job, to supplement a meager income and meet basic needs, or out of misguided loyalty.[1] Many of these defendants are unaware of the scope of the fraud and gain little or nothing from it. The guidelines, with sentences driven by the loss table, expose these defendants to sentences disproportionate to their culpability. *Watt*, 707 F. Supp. 2d at 155.

In *United States v. Hill*, 643 F.3d 807 (11th Cir. 2011), Barbara Brown received judicial relief from the guidelines. Ms. Brown was a novice appraiser caught up in a mortgage fraud scheme with a total loss of over $4 million. She earned not a single penny as a result of her

---

[1] "There is a palpable difference in culpability between a defendant who commits bank fraud to obtain a loan he fully expects and desires to repay and a defendant who commits bank fraud for the sole purpose of running off with the money—and then does so. There is a difference in culpability between an employee who goes along with a fraud simply to keep his job and earn his ordinary salary and an employee who conceives and executes a fraud with the purpose of putting its proceeds into his pocket." James Felman, *The Need to Reform the Federal Sentencing Guidelines for High-Loss Economic Crimes*, 23 Fed. Sent. R. 138, 141 (2010).

participation in the scheme. Ms. Brown, a first-time offender, faced a sentencing range of 63-78 months. The court, acknowledging "her extraordinary lack of profit" and "how the amount of loss grossly overstated her criminal conduct compared to that of the other defendants," sentenced her to 5 months imprisonment. *Hill*, 643 F.3d at 848.

**Mr. Rainford was a minimal participant.**

The defense would also request this Court to grant an adjustment based upon the defendant's role as a minimal participant in criminal activity pursuant to U.S.S.G. §3B1.2(a). According to the trial testimony, Mr. Rainford was a functionary. Due to the fact that others involved in the criminal activity were cooperating witnesses, Mr. Rainford's role has been magnified by circumstances that have little relation to his actual role in the offense. *See United States v. Restrepo*, 936 F.2d 661, 667 (2d Cir. 1991). As noted below, imposing a sentence within the guidelines upon Mr. Rainford would create unwarranted sentencing disparities merely because the most culpable parties had been arrested before him and he was unable to supply any further cooperation. In fact, Mr. Rainford's lack of knowledge is an indication that he was a minimal participant. U.S.S.G. § 3B1.2, Application Note 4 ("the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant").

**Mr. Rainford's family ties and responsibilities warrant a below Guidelines sentence.**

The defense would further request that the Court impose a below guidelines sentence due to the fact that Mr. Rainford is a unique source of financial and emotional support for his family. As noted by Mr. Rainford's sister and the mother of his children, Mr. Rainford has been a major source of financial support for his family. Exhibits A and D. At least one Court has found that the danger of being placed on welfare was sufficient to support a below guidelines sentence.

*United States v. Norton*, 218 F.Supp.2d 1014, 1019 (E.D.Wis.2002). Another Court granted probation to a defendant because his restaurant business would fail and he was the sole source of support. *United States v. Sayad*, 589 F.3d 1110 (10th Cir. 2009).

The application notes associated with U.S.S.G. §5H1.6 indicate that a sentence below the applicable guideline range may be granted, but only if family ties and responsibilities are present to an extraordinary degree. The Second Circuit has been progressive in the use and application of U.S.S.G. § 5H1.6 to grant sentences below the applicable guideline range. *United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992) (affirming a 13 level downward departure to a single mother with four children, including one child who was institutionalized); *United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997) (upholding a 13 level downward departure), *United States* v. *Greene*, 249 F. Supp.2d 262 (2d Cir. 2003) (defendant had devoted his life to parenting very disturbed and hard-to-place orphaned children, and had adopted six underprivileged boys, three of whom remained dependent on defendant as their sole financial and emotional support); *United States v. White*, 301 F.Supp.2d 289 (2d Cir. 2004) (downward departure from offense level 25 to offense level 17, on basis of extraordinary family circumstances, was appropriate).

The Court in *United States v. Ekhator*, 17 F.3d 53 (2d Cir. 1994), remanded the case to the District Court for further consideration as to whether a departure should be granted to a single mother with five children, three of whom suffered from serious health problems. The Court held that the District Court could grant a departure *sua sponte* even in a case in which the defendant had entered into a plea agreement that did not allow her to seek a departure at sentencing. *Id*.

In *United States v. Mateo*, 299 F.Supp.2d 201 (S.D.N.Y. 2004), Judge Marrero granted a 9 level downward departure based upon extraordinary family circumstances due to the fact that there were two young children who were thrust into the lives of relatives who were reporting difficulty

in raising the children. Other District Courts within the Second Circuit have also granted a sentence below the advisory guidelines when presented with family ties and responsibilities that were present to an extraordinary degree. *United Sates v. Gerard*, 782 F.Supp. 913, 914-15 (S.D.N.Y. 1992); *United States v. Pokuaa*, 782 F.Supp. 747 (E.D.N.Y. 1992); *United States v. Handy*, 752 F.Supp. 561, 564 (E.D.N.Y. 1990); *United States v. Mills*, 88 Cr. 956 (CSH), 89 Cr. 256 (CSH), 1990 WL 8081 (S.D.N.Y. Jan. 17, 1990); *United States v. Gonzalez*, 88 Cr. 559 (CSH), 1989 WL 59613 (S.D.N.Y. July 27, 1989).

The defense does not suggest that the instant charges are not serious. Similarly, the defense does not propose that the Court should only consider Mr. Rainford's family circumstances in determining a proper sentence. However, the defense submits that 18 U.S.C. § 3553 authorizes the Court to consider all factors not prohibited by law in order to craft a just and fair sentence.

**Mr. Rainford's unique characteristics support that he will not recidivate.**

In May of 2004, the United States Sentencing Commission published a report on recidivism entitled "*Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*," (available at http://www.ussc.gov/publicat/Recidivism/200405), as a component of its fifteen year report [hereinafter Fifteen Year Report] on the U.S. Sentencing Commissions Legislative Mandate. The report indicated that it was the first opportunity to assess the guidelines as they related to recidivism and that it was an effort to follow the legislative directions to assess the performance of the guidelines as they evolved based on empirical data. *Id.* at 2; USSG Chapter 1, Part A. The study found that rate of recidivism was lower for offenders who held stable employment in the year prior to the instant offense and had stable relationships. *Id.* at 12. It is important to note that Mr. Rainford has no criminal convictions.

12

Mr. Rainford's unique factors militate against the need for the imposition of a sentence that is within the advisory guidelines range. Based upon the empirical data collected by the United States Sentencing Commission, Mr. Rainford's offense conduct and recent employment status indicate that if he were to receive a sentence below the advisory guideline range, he would be among the least likely to recidivate. Clearly, the fact that he is in several categories that the Commission has studied that have the lowest rate of recidivism would tend to support the premise that a sentence based solely on deterrence is not necessary in the instant case. Mr. Rainford's presence in those categories with the lowest rates of recidivism would indicate that he would not be a danger to commit further crimes. Further, the presence of Mr. Rainford in those categories with the lowest rates of recidivism establish that the application of a within guidelines sentence would result in punishment in excess of what would be required in the instant case. The mechanical application of the advisory guidelines would ignore all of Mr. Rainford's unique history and characteristics that the Court is obligated to consider pursuant to 18 U.S.C. § 3553.

**Statistics show that longer prison sentences do not affect general or specific deterrence**

Studies show the "criminogenic" effect prison has--imprisonment can actually lead people to commit more crimes after release. *How Many Americans are Unnecessarily Incarcerated?*, 29 FED. SENT. R. 140, 141 (December 1, 2016 – February 1, 2017). Prisons provide little rehabilitative programming and often release individuals back to society without proper support, which leaves them vulnerable and likely to turn back to crime. *Id*. A 2007 National Bureau of Economic Research study found that "prison stays longer than 20 months had 'close to no effect' on reducing commission of certain crimes upon release." *How Many Americans are Unnecessarily Incarcerated?*, 29 FED. SENT. R. 140, 141 (December 1, 2016 – February 1, 2017); c*iting* Ilyana Kuziemko*, Going off Parole: How the Elimination of Discretionary Prison Release Affects the*

*Social Cost of Crime* 21 (Nat'l Bureau of Econ Research, Working Paper No. 13380, 2007), http://www.nber.org/papers/w13380.  Additionally, a 2013 paper by economist David Abrams found that longer sentences do not reduce recidivism more than shorter sentences.  *Id*. at 154; David Abrams, *The Imprisoner's Dilemma: A Cost Benefit Approach to Incarceration*, 98 IOWA L.J. 907 (2013).  Abrams  examined the effects of sentencing and parole in three cities (Chicago, Las Vegas, and Washington, D.C.) and two states (California and Georgia) and concluded that "these studies seem to find fairly consistent evidence of specific deterrence for low sentences ranges, but not for longer ones."  Abrams, 98 IOWA L. J. at 936.

An analysis of over 440,000 prisoners by psychologist Paul Gendreau in 2002 also found significant diminishing returns for longer prison sentences and he concluded that after twelve (12) months, prison stays caused higher recidivism.  29 FED.SENT. R. at 155; Paul Gendreau et al., The Effect of Prison Sentences & Intermediate Sanctions on Recidivism: General Effects & Individual Differences (2002), http://www.publicsafety.gc.ca/cnt/rsrcs/pblctns/ffcts-prsn-sntncs/index-eng.aspx.

Similarly, studies indicate that long prison sentences have little to no impact on reducing the criminal behavior of the public at large, commonly known as "general deterrence."  29 FED. SENT. R. at 156.  A study by the National Academy of Sciences in 2014 conducted a comprehensive analysis of more than a dozen leading studies on general deterrence and concluded that "the evidence on the deterrent effect of sentence length suggests that the relationship between crime rate and sentence length [has] diminishing deterrent returns" at best.  Jeremy Travis et al., Nat'l Research Council, The Growth of Incarceration in the United States: Exploring Causes and Consequences 139, 154 (2014).  *See also*, Daniel S. Nagin, *Deterrence in the Twenty-first Century: A Review of the Evidence*, 42 Crime and Justice: Crime and Justice in America 1975-

14

2025 199, 231 (2013).  *See* Daniel P. Mears, et al., *Recidivism and Time Served in Prison*, 106 J. CRIM. L. & CRIMINOLOGY 81, 82-3 (2016); *see* Edward J. Latessa, et al., WHAT WORKS (AND DOESN'T) IN REDUCING RECIDIVISM, 6-7 (2014) (describing the changes in the corrections system and longer terms of incarceration).  Proponents of longer prison sentences claim that additional time in prison exacts greater retribution and creates deterrent effects, including a specific deterrent effect that reduces recidivism.  Mears, et al., 106 J. CRIM. L. & CRIMINOLOGY at 83.  However, it is unclear exactly how specific deterrent effects of prison may unfold over varying periods of incarceration.  *Id*; *see also* David S. Abrams, *How do we decide how long to incarcerate*?, in EMPIRICAL LEGAL ANALYSIS: ASSESSING THE PERFORMANCE OF LEGAL INSTITUTIONS, (Yun-chien Chang ed., 2014); Joshua C. Cochran et al., *Assessing the Effectiveness of Correctional Sanctions*, 30 J. QUANTITATIVE CRIMINOLOGY 317, 318 (2014) (reviewing prior literature on the uncertain effects of variable amounts of time served in prison); Thomas Orsagh & Jong Rong Chen, *The Effect of Time Served on Recidivism: An Interdisciplinary Theory*, 4 J. QUANTITATIVE CRIMINOLOGY 155 (1988) (describing the time served-recidivism relationship).  Studies have found that "when prisoners serve longer sentences, they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism."  Thomas Orsagh & Jong-Rong Chen, *The Effect of Time Served on Recidivism: An Interdisciplinary Theory*, 4 J. QUANTITATIVE CRIMINOLOGY 155 (1988).

"[L]onger prison sentences were associated with a **three percent increase** in recidivism. Offenders who spent an average of 30 months in prison had a recidivism rate of 29%, compared to a 26% rate among prisoners serving an average sentence of 12.9 months."  Valerie Wright, Ph.D, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, THE

SENTENCING    PROJECT    6    (2010),    https://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf.    When prison sentences are relatively short, the offender is more likely to maintain ties to their family, employers, and community which all promote successful reentry into society.  *Id*. at 7.

The "pains or strains of imprisonment, which could contribute to deterrent effects, may be more concentrated in or felt more acutely during early stages than later stages of incarceration." Mears, et al., 106 J. CRIM. L. & CRIMINOLOGYat 83.  Notably, longer prison sentences "may allow for greater acclimation to prison culture and so a greater likelihood of offending after release to society."  *Id*. at 84.  Additionally, despite the marked increase in incarceration in recent decades, "there is no evidence that recidivism rates have improved."  *Id*. at 86.

"Data show that ex-prisoners struggle in the labor market after their period of incarceration.  In the first full calendar year after their release, only 55 percent have any reported earnings.  Among those with jobs, their median annual earnings is $10,090 and only 20 percent earn more than $15,000 that year—an amount roughly equivalent to the earnings of a full-time worker at the federal minimum wage.  Overall, the outcomes of ex-prisoners are poor despite the fact that the vast majority appear eligible for tax incentives that promote employment for low-income workers, including provisions that specifically target ex-felons."  Looney, Adam and Turner, Nicholas (2018) "*Work and Opportunity Before and After Incarceration*," Economic Studies at Brookings, The Brookings Institute, at 1.  "Research suggests the mark of a criminal record imposes impediments to employment, exacerbating economic disparities and contributing to recidivism."  *Id*. at 1; see also Pager, Devah (2003) "*The Mark of a Criminal Record*," American Journal of Sociology 108(5), at p. 937–975; Mueller-Smith, Michael (2015) "*The Criminal and Labor Market Impacts of Incarceration*."  Available at:  https://sites.lsa.umich.edu/mgms/wp-

content/uploads/sites/283/2015/09/incar.pdf).  In fact, studies show that "each additional year of incarceration reduces earnings by as much as 12 percent and that future earnings growth can be as much as 30 percent lower."  Looney, Adam and Turner, Nicholas (2018) "*Work and Opportunity Before and After Incarceration*," Economic Studies at Brookings, The Brookings Institute, at 4.

Additional studies found that "resumes with prison records are far less likely (roughly 50 percent) to get a response from employers relative to comparable resumes without a record."  *Id*. at p. 4.  "After leaving prison, ex-felons have poor employment outcomes, low earnings when working, and little attachment to the formal sector."  *Id*. at 7.  The Brookings Institute ultimately discovered that "[i]n the first full year after release…about 49 percent of ex-prisoners earn less than $500—as reported on a W2 or tax return (on Schedule C) —32 percent earn between $500 and $15,000, and only 20 percent earn more than $15,000."  *Id*.  "Among those with earnings, the median ex-prisoner earns $10,090 and the average reported earned income is $13,890. By comparison, the employment-to-population ratio of individuals with less than a high school diploma was about 41 percent in 2014, their median weekly earnings, working full-time, was $488 (about $25,000 a year if working 50 weeks), and the median annual earnings for an individual with less than a high school degree was $19,492 (BLS 2014; U.S. Census Bureau, 2006-2010 American Community Survey)."  *Id*.

## CONCLUSION

The defense urges this Court to impose a sentence that is below the advisory guidelines range which would otherwise be applicable to Mr. Rainford.  Mr. Rainford's unique history and characteristics justify a sentence below the advisory guideline range.  Further, a mechanical application of the guidelines would ignore the factors the Court is obligated to consider such as Mr. Rainford's history as well as his role as a unique source of financial support.  Similarly, such a sentence would also ignore the facts that Mr. Rainford's employment status, and his offense conduct indicate that he is among those offenders least likely to recidivate.  Thus, the defense submits that imposing a term of imprisonment within the guideline range would impose a sentence that would be greater than necessary to accomplish the goals of sentencing.

Respectfully submitted,

/s/

Calvin H. Scholar

CHS/jb

cc:    AUSA Nicholas Folly
       AUSA Alexandra Rothman
       AUSA Nicholas Chiuchiolo

       Mr. Ryan Rainford

18