

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 20, 2019

**BY ECF AND HAND DELIVERY**

The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

     **Re:**   *United States v. Robert Locust*, **S1 18 Cr. 289 (SHS)**

Dear Judge Stein:

The Government respectfully submits this letter in connection with the sentencing of defendant Robert Locust, scheduled for January 7, 2020, at 3:30 p.m.

Locust was an active participant in a massive trip-and-fall fraud scheme (the "Fraud Scheme"). The Fraud Scheme involved the recruitment of the most vulnerable members of society, including the homeless, who were forced to undergo medically unnecessary surgeries. The defendant and his conspirators attempted to defraud businesses and insurance companies of tens of millions of dollars over the course of the scheme. Locust acted as a patient recruiter and driver during the roughly two-year period that he participated in the Fraud Scheme. Notwithstanding the jury's verdict in this case, Locust has still refused to accept responsibility for *all* of his actions—most notably, his recruitment of patients.

In light of the seriousness of the defendant's crimes, and his failure to accept full responsibility, a substantial term of imprisonment, in excess of the five years recommended by Probation, would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

## Background

### I.    Offense Conduct

At trial, the evidence established that, beginning in approximately 2012, numerous individuals (the "Patients") were recruited to stage or falsely claim to have suffered trip-and-fall accidents at particular locations throughout the New York City area (the "Accident Sites"). (PSR ¶ 17). The Patients were often extremely poor—individuals desperate enough to undergo medically unnecessary surgeries in exchange for small post-surgery payments. (PSR ¶ 21). The Patients were so destitute that it was common for Patients to ask for food when they would come for their intake meetings with the lawyers. (PSR ¶ 21). Many of the Patients did not have sufficient

clothing to keep them warm during the winter and had poor quality shoes. (PSR ¶ 21). Many Patients were drug addicts. Patients were sometimes recruited from homeless shelters. For each patient recruited into the Fraud Scheme, the runners—i.e., Locust and co-defendants Bryan Duncan, Kerry Gordon, Ryan Rainford, and Reginald Dewitt—were paid approximately $1,000. (PSR ¶ 17).

In the beginning of the Fraud Scheme, Patients were instructed to claim they had tripped and fell at a particular location, when in fact the Patients had never tripped and fell at that location at all. In some of those cases, the Patients had never fallen at any location. Eventually, at the direction of the lawyers who were filing fraudulent lawsuits on behalf of the Patients, Patients were instructed to stage trip and fall accidents, i.e., to actually go to a location and deliberately fall. The reason for this change was so that the Patients would be transported to the hospital via ambulance and obtain an ambulance report, thereby making their fake accidents appear more legitimate. Common accident sites used during the Fraud Scheme included cellar doors, cracks in concrete sidewalks, and purported "pot holes" (the "Accident Sites"). (PSR ¶ 18).

After the Patients staged their accidents, the Patients were referred to one of several lawyers (the "Lawyers"), who, on behalf of the Patients, commenced personal injury lawsuits (the "Fraudulent Cases") against the property owners of the Accident Sites and/or the property owners' insurers. (PSR ¶ 19). The Fraudulent Cases did not disclose that the Patients had either deliberately or never fallen at the Accident Sites. Instead, the Fraudulent Cases claimed that the Patients' injuries resulting from the falls were solely caused by the negligence of the owners of the Accident Sites. (PSR ¶ 19). Locust and his conspirators instructed the Patients to claim that they had sustained injuries to particular areas of their bodies, including the knees, shoulders, and/or back—body parts that, if injured, reaped high recoveries in personal injury lawsuits. (PSR ¶ 19).

To pay for the Patients' medical treatment, Locust and his conspirators arranged for funding from litigation funding companies (the "Funding Companies"). (PSR ¶ 22). The Funding Companies were used to finance each Patient's medical treatment and to extend the small Post-Surgery Payments after each surgery (i.e., the $1,000 - $1,500 payments). All of the medical treatment, including surgery, payments for the MRIs, and treatment from the chiropractors, was paid through funding from the Funding Companies. Payments for each surgery were typically between approximately $10,000 - $30,000. Payments for the chiropractic treatment were typically $1,500. (PSR ¶ 22).

The Funding Companies also paid referral fees to the Patients' "case managers" each time a Patient signed a funding agreement. The referral payments, also referred to as "medical management fees," were typically between $1,000 - $2,500 for each patient who was referred. (PSR ¶ 22). Patients would often receive funding from one Funding Company, and then their cases would be bought out by a second Funding Company, thereby adding additional interest that the Patients had to pay back. In exchange for paying for the medical treatment and personal loans, the Funding Companies charged the Patients high interest rates and, as a result, received a percentage of any recovery obtained in the Fraudulent Cases. For example, one Funding Company frequently used during the Fraud Scheme charged 3.5% monthly compounding interest, and another Funding Company frequently used during the scheme charged 50% interest for the first six months, and 25% interest for the next two six-month periods. (PSR ¶ 22). The interest rates were so high that oftentimes the majority of the proceeds that were awarded in the Fraudulent

Cases went to the Funding Companies and lawyers, with the Patients receiving a much smaller percentage of the remaining recovery. (PSR ¶ 22).

In addition to recruiting Patients, Locust and his conspirators transported the Patients to their various medical and legal appointments. Locust and his conspirators often transported carloads of Patients to doctors' offices, MRI facilities, and lawyers' offices. It was common for two of the defendants and/or their co-conspirators to transport Patients to the same lawyer or doctor at the same time. (PSR ¶ 23). The lawyers paid Locust and co-conspirators a referral fee—typically between $1,000 and $2,000—for each Patient Locust (or a co-conspirator) recruited into the Fraud Scheme and transported to these appointments. (PSR ¶ 23).

Locust was a member of the Fraud Scheme from 2015 through his arrest in 2018. (PSR ¶ 33). When Locust first joined the Fraud Scheme, his primary role was to drive Patients to legal and medical appointments. (PSR ¶ 33). Locust would also deliver post-surgical payments to patients. Locust was paid between $400 and $800 per week for driving Patients. (PSR ¶ 34). As part of his work, and because Locust needed to squeeze more patients into his car, Kalkanis co-signed a lease for a new SUV for Locust. (PSR ¶ 34; Tr. 1095 ("Yes. He needed a car, first of all, so he could carry at least five to six people, number one, because that's how many people he was -- he had to carry during the day when he was working.")). Over time, Locust began recruiting Patients into the Fraud Scheme. The evidence at trial established that Locust recruited at least five patients into the Fraud Scheme, including Clarence Tucker, who testified at trial. (Tr. 540-69 (Tucker's testimony)).

During the Fraud Scheme, more than 400 Patients were referred by Locust and his co-conspirators to the lawyers in order to initiate fraudulent cases. (PSR ¶ 24). Approximately 80% of those cases were fraudulent. (PSR ¶ 24). As shown at trial, the vast majority of personal injuries cases—such as the Fraudulent Cases—are resolved through settlement agreements. (PSR ¶ 24). Typical settlements for the Fraudulent Cases ranged from $80,000 to $250,000. For example, at trial, Tucker testified that his case settled for $100,000 ($19,000 of which he received); Kasheem Jones testified that his case settled for $225,000 ($35,000 of which he received) and that his girlfriend Colette Ford's case settled for $250,000 ($55,000 of which she received); Carol White testified that her case settled for $80,000 ($6,000 of which she received); Alvin Martin testified at trial that his case settled for $120,000 ($40,000 of which he received). (PSR ¶ 24). The intended loss during the course of the Fraud Scheme was therefore at least $32,000,000. (PSR ¶ 24). However, because Locust was involved for a more limited period, the appropriate loss amount for Locust is between $9,500,000 and $25,000,000. (PSR ¶ 38).

## II.     The Charges and Trial

Superseding Indictment S1 18 Cr. 289 (SHS) (the "Indictment") was filed on April 8, 2019, charging the defendant in three counts: (1) conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349, from in or about January 2013 up to and including in or about April 2018 (Count One); (2) substantive mail fraud, in violation of 18 U.S.C. §§ 1341 and 2, from in or about January 2013 up to and including in or about April 2018 (Count Two); and (3) substantive wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, from in or about January 2013 up to and including in or about April 2018 (Count Three).

On May 28, 2019, Locust was convicted of Count One, following a three-week jury trial. After the jury failed to reach a verdict on Counts Two and Three, the Court declared a mistrial on those two counts.

Locust's co-defendants Rainford and Duncan were also convicted at trial of Count One of the Indictment. Duncan was also convicted of Counts Four through Six of the Indictment, which charged him for his participation in a second fraud scheme. Rainford and Duncan are also scheduled to be sentenced on January 7, 2020. Co-defendants Peter Kalkanis, Kerry Gordon, and Reginald Dewitt have all pleaded guilty but have yet to be sentenced.

### III.    The Presentence Report

The U.S. Probation Office determined that the total offense level for Count One is 33. The offense calculation for the defendant is as follows:

**Base Offense Level:** Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is seven. (PSR ¶ 51). Pursuant to U.S.S.G. § 2B1.1(b)(1)(K), 20 points are added because the reasonably foreseeable attempted loss was greater than $9,500,000, but less than $25,000,000. (PSR ¶ 51).

**10 or more Victims:** Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), two points are added because the offense involved ten or more victims. (PSR ¶ 52). There were hundreds of staged accidents/Fraudulent Lawsuits filed.

**Conscious/Reckless Risk of Death or Serious Bodily Injury**: Pursuant to U.S.S.G. § 2B1.1(b)(15)(A), two points are added because the offense involved the conscious or reckless risk of death or serious bodily injury. (PSR ¶ 53). As noted above, Patients were required to undergo real surgeries, including Spinal Fusions, which had extreme medical risks.

**Vulnerable Victims:** Pursuant to U.S.S.G. § 3A1.1(b)(1), two points are added because the defendant knew or should have known that a victim of the offense was a vulnerable victim. (PSR ¶ 54). As described above, the defendant and his conspirators preyed on victims who were particularly vulnerable, often destitute and living in homeless shelters or otherwise suffering from disabilities, which make them particularly susceptible to participation in the fraud scheme.

The defendant is assigned to Criminal History Category III. (PSR ¶¶ 64, 65). Accordingly, the applicable Guidelines range is 168 to 210 months' imprisonment. (PSR ¶ 101). The Probation Department believes a downward departure is appropriate, pursuant to U.S.S.G. § 4A1.3, because the defendant's criminal history is overstated. (PSR at 30). Probation also believes a variance is appropriate and recommends a sentence of 60 months' imprisonment. (PSR at 25).

## IV.      Victim Impact

The victim impact statements submitted to the Court are illustrative of the financial harm incurred by numerous businesses and insurance companies as a result of the defendant's crimes. For example, victim impact letters were submitted by Western Heritage Insurance Company, Nationwide Property and Casualty Insurance Company, and Harleysville Insurance Company of New York. As set forth in those letters, these three insurance companies alone paid out over a million dollars in claims as a result of the Fraud Scheme.

## V.      Forfeiture and Restitution

### A.  Applicable Forfeiture Law

Criminal forfeiture is "an aspect of sentencing." *Libretti v. United States*, 516 U.S. 29, 49 (1995). Under Rule 32.2 of the Federal Rules of Criminal Procedure, once a criminal defendant is convicted of the offenses giving rising to the forfeiture allegations in an Indictment, the district court must determine what property is subject to forfeiture and, if appropriate, enter a preliminary order of forfeiture. Fed. R. Crim. P. 32.2(b). Although the court may enter a preliminary order of forfeiture prior to sentencing, the order becomes final at sentencing, when the court must also orally order the forfeiture. *See* Fed. R. Crim. P. 32.2(b)(4)(A) ("At sentencing--or at any time before sentencing if the defendant consents--the preliminary forfeiture order becomes final as to the defendant."); Fed. R. Crim. P. 32.2(b)(4)(B) ("The court must include the forfeiture when orally announcing the sentence or must otherwise ensure the defendant knows of the forfeiture at sentencing."). Because fact finding at sentencing is established by a preponderance of the evidence, the preponderance of the evidence standard applies to criminal forfeiture. *United States v. Bellomo*, 176 F.3d 580, 595 (2d Cir. 1999). Accordingly, the Government must prove by a preponderance of the evidence the amount of proceeds underlying a proposed forfeiture amount such as the amount set forth in the enclosed Preliminary Order of Forfeiture.

The applicable forfeiture statutes broadly provide for the forfeiture of "[a]ny property constituting, or derived from, proceeds the person obtained directly or indirectly, as a result of such violation." 18 U.S.C. § 982(a)(2)(A); *see also* 18 U.S.C. § 982(a)(1) (the court "shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."). In addition to seeking forfeiture of specific property that was derived from or used to facilitate a crime, the Government may also obtain a money judgment against the defendant to recover the amount of the defendant's criminal proceeds. *See* Fed. R. Crim. P. 32.2; *United States v. Awad*, 598 F.3d 76, 78 (2d Cir. 2010). The amount of the money judgment should be equal to the gross proceeds of the defendant's crime, without deducting expenses. *See Bonventre*, 646 F. App'x at 90 (affirming imposition of forfeiture based on gross proceeds, rather than net proceeds, generated by defendants' fraudulent scheme); *United States v. Khan*, 761 F. App'x 43, 47 (2d Cir. 2019).

### B.  Discussion Re: Forfeiture

As set forth above, at trial the Government established that Locust received between $400 and $800 per week as salary for his participation in the Fraud Scheme. (PSR ¶ 34). Based on a conservative estimate of two years' participation in the Fraud Scheme, the defendant should be

required to forfeit $62,400[1] plus any additional sums Locust received for recruiting patients. The evidence at trial was that Locust recruited at least five different patients, and that Locust received $1,000 per patient. Accordingly, the Government respectfully requests that the Court enter the proposed Preliminary Order of Forfeiture, enclosed hereto as Exhibit A, imposing a personal money judgment of $67,400 as to Locust.

### C. Restitution

Pursuant to 18 U.S.C. § 3664(d)(5) the Court has 90 days from the date of sentencing to make a final determination of the victim's losses. The Government is continuing to obtain additional information relevant to the restitution calculation and therefore respectfully requests the Court defer its final order of restitution until 90 days after sentencing.

## Discussion

Locust was a critical member of the Fraud Scheme. Without his participation, the Fraud Scheme simply would not have worked, because Patients needed transportation to get to and from their lawyer and doctor appointments. In addition, Locust recruited Patients into the Fraud Scheme—a fact he still denies despite sitting through the trial and listening to the testimony of Clarence Tucker and Reginald Dewitt. For these reasons, a substantial term of imprisonment in excess of 60 months, but less than the Guidelines range of 168 to 210 months' imprisonment, is warranted and necessary here based on the sentencing factors the Court must consider under 18 U.S.C. § 3553(a).

*First*, a sentence in excess of 60 months' imprisonment is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A). The defendant's criminal conduct in this case was abhorrent. In order for the Fraud Scheme to succeed, Locust and his conspirators preyed on patients who were so desperate for quick cash that they would undergo multiple unnecessary surgeries in exchange for the small Post-Surgery Payments of $1,000-$1,500. The defendant cannot feign ignorance of these facts—he was *the person* picking up and dropping off Patients. It was obvious to him, as it was to everyone else, that these Patients were particularly poor, vulnerable and desperate. (*See* Tr. 110 ("They had dirty clothes and had a[n] odor."); Tr. 241 ("You get the dry mouth, you get throwing up, you get nodding off, I even had someone pee in my car one time, couldn't control himself.")).

Furthermore, in order to maximize the amount of money Locust and his conspirators earned through the Fraudulent Cases, Locust and his conspirators pressured the Recruited Patients into getting dangerous, painful, and medically unnecessary surgeries with promises of large settlements. For example, at trial, Tucker testified that Locust

> asked me did I want to make any extra money, and I said yes. And
> he said, you know, you can could make a thousand dollars and then

---

[1] This number is calculated by multiplying $600 (the average of $400 and $800) by 104 (the number of weeks in two years).

> you would have to stage an accident…I could make, depending on insurance and the incident, my fall, that I could make 100,000 or better.

(Tr. 543-44).  While it is true that other participants in the Fraud Scheme made more money than Locust did, Locust overlooks that he made his living through his participation in the Fraud Scheme. He earned between $400 and $800 each week driving Patients, in addition to the thousands of dollars he earned recruiting Patients.  It is simply no excuse to Locust's conduct that other people made more money.

*Second*, a sentence in excess of 60 months is necessary to afford adequate deterrence to others and to protect the public from further crimes of the defendant.  18 U.S.C. § 3553(a)(2)(B) – (C).  As noted above, the defendant's conduct was very serious—he participated in a fraud scheme for more than two years that involved tens of millions of dollars in bogus lawsuits and that exploited the most vulnerable members of the New York City community.  A substantial sentence in excess of 60 months is therefore necessary to deter others from engaging in serious criminal conduct like the defendant's.  Relatedly, a substantial sentence in excess of 60 months' imprisonment is necessary to protect the public from further crimes of the defendant.  As noted below, because the defendant has not accepted full responsibility for his actions, there is a significant risk that the defendant will return to illegal avenues to make money, willing to justify his actions based on the same justifications he provides to this Court in his sentencing letter.

It is troubling that, to date, the defendant has failed to accept *full* responsibility for his actions, despite claiming to the Court that he has done so.  Defense counsel still describes Locust as "essentially a driver," (Def. Mem. at 7), even though the facts at trial proved that Locust also recruited patients into the Fraud Scheme.  The defendant describes himself as a "schmuck" who "got swept into a horrible situation." (Def. Mem., Ex. B).  He seems to think that because he was not a "kingpin" and because other people, such as lawyers and doctors, were also involved, he should avoid punishment for his actions.  However, Locust's attempts to play the victim are offensive, particularly when considered in light of the fact that Locust's actions hurt real victims. People like Clarence Tucker, among others, who were recruited by Locust, promised large sums of money, and then placed in serious danger through unnecessary medical procedures.

In sum, Locust participated in an egregious fraud for at least two years.  The Government recognizes that the Guidelines range of 168 to 210 months, which is largely driven by the substantial loss amount, is too high based on the defendant's conduct.  However, each of the other enhancements under the Guidelines appropriately capture distinct aspects of the defendant's criminal conduct.  As for relative culpability, the Government views Locust as less culpable than Rainford and Duncan, who are also being sentenced on January 7, 2020, because Locust was involved in the Fraud Scheme for fewer years and recruited fewer Patients than Rainford, and because, unlike Duncan, Locust never left to start his own fraud scheme where he managed cases. Nevertheless, in light of all of these factors, the Government believes that a substantial term of imprisonment, below the Guidelines range but in excess of the 60 months' recommended by Probation, would be fair and appropriate in this case.

## Conclusion

For the foregoing reasons, the Court should impose a substantial term of imprisonment in excess of 60 months, in addition to restitution and forfeiture.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:_____/s/_____
Alexandra Rothman
Nicholas Folly
Nicholas Chiuchiolo
Assistant United States Attorneys
(212) 637-2580

Cc:    Defense counsel (by ECF)