1:18-cr-00289-SHS-5

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Aug 02 2024

20-359 (L)
*United States v. Rainford et al.*

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

---

AUGUST TERM 2022
Nos. 20-359, 20-2695, 20-2993, 21-1753

UNITED STATES OF AMERICA,
*Appellee*,

v.

RYAN RAINFORD, BRYAN DUNCAN, ROBERT LOCUST,
*Defendants-Appellants*,

PETER KALKANIS, KERRY GORDON, aka CURRY,
*Defendants*.[*]

---

On Appeal from the United States District Court
for the Southern District of New York

---

ARGUED: MAY 1, 2023
DECIDED: AUGUST 2, 2024

---

Before:     JACOBS, MENASHI, and MERRIAM, *Circuit Judges*.

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

CERTIFIED COPY ISSUED ON 08/02/2024

The defendants-appellants, who were convicted of orchestrating a fraudulent slip-and-fall scheme, challenge their convictions, their guidelines calculations, and their sentences.

Because none of the challenges to the convictions are persuasive, we affirm the judgments of conviction. We also affirm with respect to the guidelines calculations, but we remand for factfinding as to the number of fraudulent accidents the conspiracy orchestrated while Rainford and Locust were members of the conspiracy for the purpose of computing the loss enhancement under U.S.S.G. § 2B1.1. With respect to the sentences, we (1) vacate and remand Duncan's forfeiture order, concluding that it was based only on government allegations, not on factual material, (2) affirm the district court's restitution order for Rainford and Locust but modify the order by $120,000, and (3) affirm Rainford's sentence but remand to the district court to reconsider the sentence "as may be just under the circumstances." 28 U.S.C. § 2106.

Judge Jacobs concurs in a separate opinion. Judge Merriam concurs in part and dissents in part in a separate opinion.

---

> ALEXANDRA N. ROTHMAN, Assistant United States Attorney (Nicholas W. Chiuchiolo, Nicholas S. Folly, David Abramowicz, Assistant United States Attorneys, *on the brief*), *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

DONNA R. NEWMAN, Law Offices of Donna R. Newman, PA, New York, NY, *for Defendant-Appellant Ryan Rainford.*

Bryan Duncan, *pro se*, *for Defendant-Appellant Bryan Duncan.*

RANDALL DOUGLAS UNGER, Law Offices of Randall Douglas Unger, Kew Gardens, NY, *for Defendant-Appellant Robert Locust.*

---

MENASHI, *Circuit Judge*:

Defendants-Appellants Ryan Rainford, Robert Locust, and Bryan Duncan appeal their convictions and sentences for conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349.[1] Duncan proceeds *pro se* on appeal.

The convictions arose from a fraudulent slip-and-fall scheme that the defendants and others orchestrated. The scheme involved recruiting poor and homeless people to fake accidents at properties around the New York area. The recruit would stage an accident and then seek unnecessary medical treatment—sometimes including surgery—from doctors who were part of the scheme. The organizers of the scheme would then refer the recruit to a lawyer, who would sue the property owner or the owner's insurance company for damages. The proceeds from the lawsuits, which often settled, were then divided among the co-conspirators, with the recruits receiving relatively little.

---

[1] Duncan was convicted of two counts of conspiracy to commit mail and wire fraud as well as one substantive count of mail fraud and one substantive count of wire fraud.

3

The defendants raise several arguments on appeal. We affirm with respect to each issue relating to the trial and convictions. *See infra* Part I. We affirm the judgment with respect to the sentencing guidelines calculations, but we remand for factfinding as to the number of fraudulent accidents orchestrated by the conspiracy while Rainford and Locust were members for the purpose of performing a loss calculation under U.S.S.G. § 2B1.1. *See infra* Part II. Finally, we vacate and remand Duncan's forfeiture order, affirm but modify the restitution order for Rainford and Locust, and affirm Rainford's sentence but remand for reconsideration in the interest of justice. *See infra* Part III.

## BACKGROUND

The conduct underlying this appeal involves two fraudulent slip-and-fall schemes. The first scheme began around 2013 and included Rainford, Duncan, and Locust. Peter Kalkanis was the principal organizer of the first scheme, and Rainford, Duncan, and Locust were lower-level co-conspirators known as "runners." The runners would seek out people who were often poor or homeless. They would then find suitable locations for slip-and-fall accidents and instruct a recruit to stage a fall at the location and to seek medical attention for nonexistent injuries. Sometimes, the unnecessary medical attention included surgery.

The recruit was then referred to a lawyer who would pursue a personal injury lawsuit on his or her behalf. Kalkanis would typically sit in on a recruit's meeting with the attorney. At the meeting, Kalkanis would record pertinent information on an "intake sheet," which included the name of the recruit as well as others involved in the "accident," including the runner who referred the recruit to the scheme. Notably, some of the intake sheets processed in this way

were not fraudulent but documented genuine slip-and-fall accidents and legitimate legal claims. When asked at trial how many of the intake sheets involved fraudulent slip-and-falls, Kalkanis initially testified that "[a]t least 80 percent" were fraudulent. Rainford App'x 884. Kalkanis then backtracked, saying that "practically all of them" were fraudulent. *Id.* When asked to clarify, Kalkanis said "the majority of them" were fraudulent. *Id.* The district court noted that Kalkanis had given different answers to the same question; Kalkanis then reiterated that "[t]he majority of them" were fraudulent. *Id.* When asked how many cases he managed during the first conspiracy, Kalkanis estimated that there were "[a]pproximately 300, if not more." *Id.* at 883.

The runners also ensured that the recruits attended medical and legal appointments by transporting them to those appointments. The organizers of the scheme would arrange for litigation funding companies to underwrite the medical expenses and litigation. While litigation proceeded, the organizers would often arrange "loans" to the recruits from the litigation funding companies to pay expenses. One witness testified that he used his loan to pay for "anything, whether it be rent, bills" as well as "to pay the medical facilities for the surgeries that [he] would need." *Id*. at 751. The lawsuits frequently resulted in settlements, often for six figures. The proceeds were distributed among the organizers, doctors, lawyers, litigation funders, and others involved in the scheme. The recruit would receive what was left.

One recruit who testified at trial was Yvette Battle. After staging a fraudulent slip-and-fall, Battle underwent knee surgery for which she received anesthesia. She was compensated with $1,000 along with cookies and juice. *See id.* at 685. A "couple of months later," she underwent a shoulder surgery and in exchange for the surgery

she was paid $1,000. *Id*. at 685-88. She filed an action against the owner of the property where she staged the accident. That action was "[d]ismissed" and she received nothing of value from that lawsuit. *Id*. at 689. During the government's examination of Battle, the prosecutor referred to these $1,000 payments as "loans," *id*., and Battle did not correct that characterization. Some recruits whose cases settled received larger payouts. One recruit who underwent shoulder surgery received $19,000 out of a $100,000 settlement, and another who underwent back and knee surgery received $35,000 out of a $225,000 settlement.

In 2015, Duncan and Kerry Gordon—another co-conspirator in the Kalkanis scheme—began a spin-off scheme. That scheme was substantially similar to the Kalkanis scheme, often using the same attorneys, doctors, and low-level co-conspirators. Duncan and Gordon created a business entity—D&G Premier Solutions LLC ("D&G")—to operate the scheme. D&G would connect recruits with litigation funding companies. D&G would receive a referral fee from a funding company after the company contracted with a recruit to provide payments in exchange for the recruit's future settlement amount.

In 2019, a six-count superseding indictment was returned against the co-conspirators in the two schemes. Rainford, Duncan, and Locust were each charged with three counts in connection with the Kalkanis scheme: conspiracy to commit mail and wire fraud (Count One), mail fraud (Count Two), and wire fraud (Count Three). *Id.* at 60-64. Duncan was indicted on three additional counts relating to the spin-off scheme: conspiracy to commit mail and wire fraud (Count Four), mail fraud (Count Five), and wire fraud (Count Six). *Id.* at 64-67.

The government presented extensive evidence of guilt at trial. Almost a dozen recruits testified that they had participated in the schemes by staging accidents and receiving unnecessary medical treatment. Kalkanis also testified. He stated that he "directed the traffic" in the first scheme and "was a manager in th[e] whole thing." *Id.* at 819. Kalkanis elaborated that the scheme was fraudulent because "these weren't real accidents." *Id.* And he identified Locust, Rainford, and Duncan as members of the conspiracy. *Id.* at 819-20. The government also introduced the intake sheets, medical records, and communications between the co-conspirators.

The jury found Rainford, Locust, and Duncan guilty of conspiracy to commit mail and wire fraud in connection with the Kalkanis scheme (Count One). *See id.* at 1226.[2] The jury also found Duncan guilty of conspiracy to commit mail and wire fraud (Count Four), mail fraud (Count Five), and wire fraud (Count Six) in connection with the spin-off scheme. This appeal followed.

## DISCUSSION

Rainford, Duncan, and Locust raise several arguments on appeal. We begin with the arguments relating to the trial and convictions, and we affirm the judgment of the district court with respect to those issues. *See infra* Part I. We next consider the defendants' challenges to their sentencing guidelines calculations. We affirm the judgment with respect to the calculations, but we remand for additional factfinding relating to the loss enhancements for Rainford and Locust. *See infra* Part II. Finally, we address the defendants' arguments about their sentences. We vacate and remand

---

[2] The district court declared a mistrial as to Counts Two and Three; the government then moved to dismiss those counts, and the district court granted the motion. *See* Rainford App'x 1353.

Duncan's forfeiture order because the district court relied only on representations by the government, not on evidence, in calculating the forfeiture amount. We affirm the district court's restitution order for Rainford and Locust, but we modify the order as the parties agree. And we affirm Rainford's sentence of imprisonment but remand with instructions to reconsider it in the interest of justice. *See infra* Part III.

## I

First, we consider the defendants' challenges to their convictions.

## A

Duncan argues that his due process rights were violated because the government introduced false testimony by Alvin Martin, Reginald Dewitt, and Tina Nichols. The government may not knowingly introduce false evidence or testimony to obtain a conviction. *See United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018). A witness does not perjure himself merely by giving incorrect, confusing, or mistaken testimony: "Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001). Rather, a witness commits perjury "if he gives false testimony concerning a material matter with the willful intent to provide false testimony." *United States v. Aquart*, 912 F.3d 1, 20 (2d Cir. 2018) (quoting *Monteleone*, 257 F.3d at 219).

Duncan has identified no false testimony by Martin, Dewitt, or Nichols that was material to his conviction and that the government knew was false. Duncan points to (1) Martin's testimony that Kalkanis was his attorney; (2) Martin's confusion as to whether his attorney's office was in Astoria, Queens; (3) Martin's testimony as to who entered a meeting with the lawyer at a certain time; (4) Martin's

8

recollection of a person's name; and (5) Martin's testimony as to whether his mother lied to the government. But Duncan has not established that any of this testimony—assuming it was false—was material to his conviction or that the government knew the testimony was false. The same is true of Duncan's claim that Dewitt perjured himself by stating that he was not involved in any cases in 2014, despite an intake form from 2014 listing him as a runner for the conspiracy.

Finally, Duncan notes that Nichols testified that she had been recruited by Duncan, but other pieces of evidence indicated that Dewitt made the referral. This may not be a contradiction—recruitment and referral may be different concepts—but in any event Duncan has not established how the testimony was material. He has identified, at most, a "[s]imple … inconsistenc[y]." *Monteleone*, 257 F.3d at 219.

Because Duncan has not identified a material falsity known to the government, we affirm with respect to this issue.

**B**

Duncan also argues that the district court erred by admitting intake sheets—documents Kalkanis created that recorded pertinent information about each slip-and-fall accident—into evidence. Duncan's brief does not make clear the basis of his argument. But because "[a] document filed *pro se* is to be liberally construed," *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)), we interpret Duncan's brief as (1) arguing that the intake sheets were not relevant because Kalkanis testified he had no personal knowledge of which cases were fraudulent and which were legitimate and (2) raising a Confrontation Clause claim.

We review a district court's evidentiary decisions for abuse of discretion. *See United States v. Persico*, 645 F.3d 85, 99 (2d Cir. 2011). Duncan's argument that the intake sheets were irrelevant is mistaken. Kalkanis testified that he personally filled out the intake sheets and that he did so while meeting with the recruit. *See* Rainford App'x 857 ("These are combination intake sheets that I did with each individual patient."). Even if Kalkanis himself could not say which intake sheets involved fraudulent slip-and-falls and which involved legitimate accidents, we cannot conclude that the intake sheets documenting the accidents in the scheme had no "tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a).

Separately, Duncan contends that intake sheets were admitted for recruits who did not testify, which violated his Sixth Amendment right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause prohibits the admission of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). In this case, Duncan had the opportunity to cross-examine Kalkanis, who drafted the intake sheets, so there was no violation of the Confrontation Clause.

We affirm the district court's judgment with respect to the admission of the intake sheets into evidence.

## C

Locust argues that the district court's summary denial of his motion for appointment of new counsel deprived him of his right to effective assistance of counsel. We disagree.

We review the denial of a motion to substitute counsel for abuse of discretion. *United States v. Simeonov*, 252 F.3d 238, 241 (2d Cir.

10

2001). We consider four factors: (1) whether the motion for new counsel was timely; (2) whether the district court adequately inquired into the matter; (3) whether the conflict between the defendant and his attorney was so great that it caused a lack of communication and prevented an adequate defense; and (4) whether the defendant substantially and unjustifiably contributed to the breakdown in communication. *United States v. Hsu*, 669 F.3d 112, 122-23 (2d Cir. 2012).

Locust's argument fails because he waived the argument before the district court. One trial day after Locust's motion was denied, the district court directly asked Locust: "[Y]ou've indicated that you don't want to go pro se here and you want to continue with Dinnerstein and Cecutti [Locust's trial counsel], correct?" Supp. App'x 25-26. Locust replied: "Yes, sir." *Id.* at 26. That statement was an "intentional relinquishment or abandonment of a known right, and … permanently extinguishe[d] the right to raise the claim" on appeal. *United States v. Polouizzi*, 564 F.3d 142, 153 (2d Cir. 2009) (internal quotation marks omitted).

Locust responds that he did not waive the argument because the district court was clear that any motion for new counsel would have been futile. But the cases on which Locust relies for that proposition—despite using the term "waiver"—each address the failure to object, not the intentional relinquishment of a right. *See Anderson v. Branen*, 17 F.3d 552, 556-57 (2d Cir. 1994); *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 177-79 (2d Cir. 1992). Locust misses this critical distinction. "Waiver is different from forfeiture. Whereas *forfeiture* is the failure to make the timely assertion of a right, *waiver* is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (emphasis added) (internal quotation marks omitted). We have "discretion to correct

errors that were *forfeited* because not timely raised in the district court, but no such discretion applies when there has been true *waiver*." *United States v. Spruill*, 808 F.3d 585, 596 (2d Cir. 2015). Locust's response when the district court asked if he wished to proceed was intentional and affirmative—and it qualified as a waiver. Accordingly, *Anderson* and *Ostrowski* provide no basis for applying a discretionary exception. Locust has waived this argument.

Even if he had not waived it, the argument would fail. Locust's motion for new counsel was made during the trial. "[O]nce trial has begun, a defendant has no unbridled right to reject assigned counsel and demand another" because defendants may "manipulat[e] … the right so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice." *United States v. John Doe No. 1*, 272 F.3d 116, 122 (2d Cir. 2001) (internal quotation marks omitted). Locust contends that the motion was timely because it responded to his counsel's performance *at trial*. Indeed, Locust identifies several comments by the trial judge indicating dissatisfaction with Locust's counsel. That may affect our analysis of the timeliness prong. *See Hsu*, 669 F.3d at 122. But it cuts against Locust overall. If Locust's belief that his counsel was deficient was based on his counsel's performance at trial, then the district court did not need to make a special inquiry into his counsel's performance; the district court had witnessed the counsel's performance during the trial. And the district court evaluated that performance. In denying Locust's motion, the district court stated that it "f[ou]nd the representation of [Locust's trial counsel] to be quite good." Locust App'x 37. Moreover, Locust confirmed to the district court that the purported deficiency was "due to the conduct of the trial," *id.* at 38, and was not based on a lack of communication, *see Hsu*, 669 F.3d at 123.

Locust suggests that the district court should have asked more targeted questions. But, on these facts, we see no abuse of discretion in failing to inquire further about the counsel's conduct at trial. Locust's challenge on appeal therefore would fail on the merits even if it had not been waived.

We affirm the district court's judgment with respect to the denial of Locust's motion for new counsel.

**D**

Locust further argues that the prosecutor committed "several serious improprieties" at closing argument, prejudicing his right to a fair trial. Locust Br. 32.

Prosecutorial remarks "do not amount to a denial of due process unless they constitute 'egregious misconduct.'" *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974)). So long as a prosecutor does not "misstate the evidence," he or she is entitled to "wide latitude during closing arguments." *United States v. Tocco*, 135 F.3d 116, 130 (2d Cir. 1998). Even if a prosecutor's remarks were improper, a defendant will succeed on a misconduct claim only when "the remarks, taken in the context of the entire trial, resulted in substantial prejudice." *United States v. Thomas*, 377 F.3d 232, 244 (2d Cir. 2004) (quoting *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998)). When evaluating prejudice, we consider three factors: (1) "the severity of the misconduct," (2) "the measures adopted to cure the misconduct," and (3) "the certainty of conviction absent the misconduct." *United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002). A new trial is ordered only in a "rare case." *United States v. Rodriguez*, 968 F.2d 130, 142 (2d Cir. 1992) (quoting *Floyd v. Meachum*, 907 F.2d 347, 348 (2d Cir. 1990)). When the defendant failed to object to the challenged remarks, we review for

13

plain error and will not reverse unless the remarks "amount to flagrant abuse which seriously affects the fairness, integrity, or public reputation of judicial proceedings, and causes substantial prejudice to the defendant." *United States v. Williams*, 690 F.3d 70, 75 (2d Cir. 2012) (internal quotation marks omitted).[3]

Locust identifies four purported improprieties. None require reversal.

First, Locust contends that the government vouched for four witnesses: Tucker, Dewitt, Kalkanis, and Martin. Locust did not object to the comments that allegedly vouched for those witnesses, so we review for plain error. Locust explains that the prosecutor vouched when she made statements such as "Dewitt's telling the truth." Locust Br. 35. But the government surrounded these statements with references to items submitted into evidence, so the statements "turn out on closer examination to be permissible reference to the evidence in the case" rather than vouching. *Perez*, 144 F.3d at 210. In context, the government's statements that the witnesses were telling the truth "did not imply the existence of extraneous proof and cannot be characterized as improper vouching." *Williams*, 690 F.3d at 76 (internal quotation marks omitted). Even if the statements did

---

[3] "The Supreme Court has identified four prongs of plain error analysis: (1) there must be an error; (2) the error must be plain, meaning it must be clear or obvious, rather than subject to reasonable dispute; (3) the error must have affected the appellant's substantial rights in that it affected the outcome of the proceedings; and (4) if these other three prongs are satisfied, the court of appeals has the discretion to remedy the error if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Montague*, 67 F.4th 520, 528 (2d Cir. 2023) (internal quotation marks and alteration omitted), *judgment vacated on other grounds*, No. 23-959, 2024 WL 3014465 (U.S. June 17, 2024).

amount to vouching, such statements do not constitute "flagrant abuse." *Id.* at 75. The district court did not plainly err by failing to intervene.

Second, Locust argues that the prosecutor "denigrated" the defense by saying, for example, that its case was a "total sideshow." Locust Br. 33; *see* Locust App'x 113. Locust did not object to these statements, so we again review for plain error. One component of Locust's defense was that the government should have focused on the corrupt lawyers rather than low-level co-conspirators such as Locust. *See* Supp. App'x 1, 61. In describing that strategy as a "sideshow," the prosecutor responded to the defense's arguments, which is permissible in a closing argument. *See United States v. Salameh*, 152 F.3d 88, 139 (2d Cir. 1998) ("[T]he Government is ordinarily permitted to respond to arguments impugning the integrity of its case and to reply with rebutting language suitable to the occasion.") (quoting *United States v. Bagaric*, 706 F.2d 42, 60 (2d Cir. 1983)). We again see no plain error.

Third, Locust claims that the prosecutor misstated the evidence when she said that Locust orchestrated three slip-and-fall accidents. Locust did not object when the government stated in closing that Locust brought three recruits into the scheme—Gilford, Roberts, and Wright—so we review for plain error. Locust notes that those recruits were not called to testify. Locust argues that, even assuming that he introduced the three recruits to the other members of the scheme, there was no evidence that their claims were fraudulent because Kalkanis testified that he could not specify which claims were fraudulent and which were genuine. For that reason, Locust says, the government misstated the evidence.

15

But there was evidence that Locust brought in these recruits to make fraudulent claims. The intake sheets for these recruits listed the name "Robert" or "Rob" as the runner. Supp. App'x 110-11, 113. Locust's first name is Robert. Dewitt testified that Locust had reported staging fake slip-and-fall accidents at a Wendy's restaurant, at a bike shop, and at a Domino's restaurant—the locations at which Gilford, Roberts, and Wright had accidents. Rainford App'x 199-200. While the government's description of Dewitt's testimony and the intake sheets may have been somewhat conclusory, we again see no "flagrant abuse," *Williams*, 690 F.3d at 75, and the district court did not plainly err in failing to intervene.

Fourth, Locust argues that the prosecutor lowered the burden of proof by asserting that it did not matter whether Locust knew for certain that the slip-and-fall accidents were staged. The prosecutor stated at closing that "[e]ven if Locust did not know for certain, he is still guilty. He was aware there was a high probability that these patients had staged accidents." Locust App'x 117. Locust's counsel promptly objected, saying "[t]hat's not the standard." *Id.* The district court sustained the objection and reminded the jury immediately that "the government's burden is proof beyond a reasonable doubt. Remember that." *Id.* Accordingly, even if the government's statement constituted misconduct, Locust has not established prejudice. The jury was immediately reminded that the standard is beyond a reasonable doubt, and we presume that juries follow the instructions. *See United States v. Becker*, 502 F.3d 122, 130 (2d Cir. 2007). We are not persuaded that any misconduct affected the verdict. *See Elias*, 285 F.3d at 190.

For these reasons, Locust has not shown that the government committed misconduct or that, if it did, the misconduct prejudiced the

outcome of his trial. We affirm the district court's judgment with respect to this issue.

## II

Second, we consider the defendants' challenges to their sentencing guidelines calculations. We affirm the district court's judgment with respect to the calculation for each defendant. However, we remand for factfinding as to the number of fraudulent accidents the conspiracy orchestrated while Rainford and Locust were members for the purpose of performing a loss calculation under U.S.S.G. § 2B1.1(b)(1).[4]

We review a district court's application of the guidelines *de novo*, but factual determinations are reviewed for clear error. *See United States v. Cramer*, 777 F.3d 597, 601 (2d Cir. 2015). However, when a defendant fails to object to a procedural error in the district court's guidelines calculation, we review for plain error. *See United States v. Verkhoglyad*, 516 F.3d 122, 128 (2d Cir. 2008).

## A

All three defendants argue that the district court erred when it included a guidelines enhancement due to the "loss" associated with

---

[4] The practice of leaving in place a judgment but "remand[ing] partial jurisdiction to the district court to supplement the record on a discrete factual or legal issue while retaining jurisdiction over the original appeal" is known in this circuit as a *Jacobson* remand. *United States v. Rosa*, 957 F.3d 113, 121 n.29 (2d Cir. 2020) (quoting *Corporación Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploración y Producción*, 832 F.3d 92, 115 (2d Cir. 2016) (Winter, J., concurring)); *see United States v. Jacobson*, 15 F.3d 19, 22 (2d Cir. 1994).

the schemes. We agree, but only insofar as the argument applies to Rainford and Locust.

U.S.S.G. § 2B1.1(b)(1) imposes an enhancement when the "loss" exceeds certain levels. As relevant here, if the loss is between $9.5 million and $25 million, the defendant receives a twenty-level increase; if the loss is between $25 million and $65 million, the defendant receives a twenty-two-level increase. U.S.S.G. § 2B1.1(b)(1)(K)-(L). The application note clarifies that the "loss is the greater of actual loss or intended loss." *Id.* § 2B1.1, comment. (n.3(A)). And the "intended loss" means "the pecuniary harm that the defendant purposely sought to inflict," even including "pecuniary harm that would have been impossible or unlikely to occur." *Id.* § 2B1.1, comment. (n.3(A)(ii)). In *Stinson v. United States*, the Supreme Court explained that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." 508 U.S. 36, 38 (1993). Here, the application note defining loss is neither inconsistent with nor a plainly erroneous reading of the guideline. "[T]he term 'loss' in § 2B1.1 has no one definition and can mean different things in different contexts," so the guideline does not contradict the understanding expressed in the commentary that "loss" encompasses intended loss. *United States v. You*, 74 F.4th 378, 397 (6th Cir. 2023) (internal quotation marks omitted).[5]

---

[5] The continuing vitality of *Stinson* is subject to debate. *See* John S. Acton, *The Future of Judicial Deference to the Commentary of the United States Sentencing Guidelines*, 45 Harv. J.L. & Pub. Pol'y 349, 355 (2022) (describing "four discrete issues" that have "complicated … *Stinson* deference's scope"). The holding in *Stinson* rested on the comparison of the guidelines

To apply § 2B1.1(b)(1), the sentencing court "is only required to make a 'reasonable estimate of the loss.'" *United States v. Lacey*, 699 F.3d 710, 719 (2d Cir. 2012) (quoting U.S.S.G. § 2B1.1, comment.

---

commentary to "an agency's interpretation of its own legislative rule." 508 U.S. at 44 (citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). After the Supreme Court modified the framework for reviewing an agency's interpretation of its own rule, *see Kisor v. Wilkie*, 588 U.S. 558, 574-75 (2019), circuit courts have disagreed as to whether the application note defining "loss" to include the intended loss should continue to receive deference. *Compare United States v. Banks*, 55 F.4th 246, 258 (3d Cir. 2022) ("[T]he ordinary meaning of the word 'loss' is the loss the victim actually suffered. … Because the commentary expands the definition of 'loss' by explaining that generally 'loss is the greater of actual loss or intended loss,' we accord the commentary no weight."), *with You*, 74 F.4th at 397 ("Applying *Kisor*'s framework, we defer to the Sentencing Commission's interpretation of 'loss.'").

We adhere to *Stinson* and defer to the application note for two reasons. First, the Supreme Court has not overruled *Stinson*. "[I]f a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quoting *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989)). Second, the guidelines commentary would meet the *Kisor* standard in any event. Because the Sentencing Commission adopts the commentary alongside the guidelines, *see United States v. Moses*, 23 F.4th 347, 353 (4th Cir. 2022) ("[T]he Commission, in practice, generally follows the same process for adopting and amending policy statements and commentary as it uses for the promulgation and amendment of the Guidelines themselves."), the commentary necessarily reflects the Commission's "authoritative, expertise-based, fair, or considered judgment," *Kisor*, 588 U.S. at 573 (internal quotation marks and alteration omitted). Indeed, the guidelines and the commentary "operate together as a reticulated whole," *Moses*, 23 F.4th at 355, and accordingly "the two are to be read together," *United States v. Pedragh*, 225 F.3d 240, 244 (2d Cir. 2000).

(n.3(C))). Even so, the sentencing court must "make findings that are sufficiently specific to permit meaningful appellate review." *United States v. Flores*, 945 F.3d 687, 721 (2d Cir. 2019). "A district court satisfies its obligation to make findings sufficient to permit appellate review if the court indicates, either at the sentencing hearing or in the written judgment, that it is adopting the recommendations in the PSR"—that is, the Presentence Report. *United States v. Wagner-Dano*, 679 F.3d 83, 90 (2d Cir. 2012) (internal quotation marks and alterations omitted) (quoting *United States v. Prince*, 110 F.3d 921, 924 (2d Cir. 1997)). But "adoption of the PSR does not suffice if the PSR itself does not state enough facts to permit meaningful appellate review." *United States v. Ware*, 577 F.3d 442, 452 (2d Cir. 2009). When the sentencing court makes findings adequate to permit appellate review, "its findings of fact will be overturned only if they are clearly erroneous." *Flores*, 945 F.3d at 721.

We have held that a sentencing court's methodology was not "too crude" when it calculated a loss amount based on two factors: the total profits of the scheme and testimony as to the underlying percentage that was fraudulent. *United States v. Moseley*, 980 F.3d 9, 29 (2d Cir. 2020); *see also United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009) ("A district court may make a reasonable estimate by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown.") (internal quotation marks omitted). That is the method the district court used in this case to calculate the loss, and the defendants do not challenge the district court's methodology.

We therefore proceed to evaluate for clear error the district court's factual determinations regarding (1) the intended loss of the

20

schemes and (2) the number of fraudulent accidents in which each defendant was involved.[6]

**1**

The defendants' PSRs indicated that the intended loss for each fraudulent accident was $100,000 and that this estimate is a "conservative" one because it represents a "low settlement amount for a … Fraudulent Case." Rainford PSR ¶ 43; Locust PSR ¶ 38; Duncan PSR ¶ 32. In support of that conclusion, the PSRs referenced (1) Clarence Tucker's testimony that his case settled for $100,000, (2) Kasheem Jones's testimony that his case settled for $225,000 and that his girlfriend's case settled for $250,000, (3) Carol White's testimony that that her case settled for $80,000, and (4) Alvin Martin's testimony that his case settled for $120,000. *See, e.g.*, Rainford PSR ¶ 24. The district court adopted these findings for each defendant. *See* Rainford App'x 1281 (Locust); *id.* at 1299 (Rainford); *id.* at 1234 (Duncan). It thereby satisfied its obligation to adopt findings of fact "sufficient to permit appellate review." *Wagner-Dano*, 679 F.3d at 90; *see also Ware*, 577 F.3d at 452.

Even if it had not adopted the facts in the PSRs, the district court made several statements at the sentencing hearings indicating that it had independently found the intended loss for each fraudulent accident was, conservatively, about $100,000. The district court observed that "sometimes it was held out to people that they could make up to a hundred thousand dollars." Rainford App'x 1278. And

---

[6] As explained below, Locust objected specifically to the loss calculation, so we review for clear error, but Rainford and Duncan did not. *See infra* Part II.A.2. Because we conclude that the factual finding about the intended loss of $100,000 per fraudulent case was not clearly erroneous, we need not conduct a separate plain error analysis for Rainford and Duncan.

the district court showed that it was focused on *intended* loss—as opposed to actual loss—when it asked the government, "where does the foreseeable loss per recruit of each victim of a hundred thousand come from?" *Id*. at 1279. The government responded with specific evidence: "Clarence Tucker testified at trial … that he was told by Mr. Locust he could make a hundred thousand dollars or better in staging an accident." *Id*. These figures were conservative; if the recruit were told to expect compensation of about $100,000, then the intended loss to the insurance company would need to be substantially higher in order to pay runners, organizers, doctors, lawyers, and others who were involved in the conspiracy.

Moreover, to conduct a clear error review, we must review the "entire evidence." *United States v. Mattis*, 963 F.3d 285, 291 (2d Cir. 2020) (quoting *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007)). Here, there was evidence introduced at trial indicating that many cases settled for six figures. *See* Rainford App'x 528, 562, 1087. And the district judge emphasized several times at the sentencing hearings that he presided over the trial and had a command of the evidence. *See, e.g., id.* at 1255 ("I am quite comfortable, as the judge who presided over your trial, that there was extensive evidence, extensive credible evidence."). We have never required a sentencing court to have stated all the facts in the record on which it based its findings, only enough to "permit meaningful appellate review." *Flores*, 945 F.3d at 721. And on clear error review, even if there are "two permissible views" of the facts, "the factfinder's choice between them cannot be clearly erroneous." *United States v. Norman*, 776 F.3d 67, 76 (2d Cir. 2015) (quoting *United States v. Abiodun*, 536 F.3d 162, 170 (2d Cir. 2008)).

In this case, the settlement numbers fell along a range. It may have been possible for a reasonable factfinder to conclude that the

intended loss was less than $100,000. But there was also enough evidence to conclude that the intended loss was $100,000 or more. For that reason, the district court's choice of the latter view "cannot be clearly erroneous," *Norman*, 776 F.3d at 76, and we will not disturb the district court's finding that the intended loss for each fraudulent accident was $100,000.

**2**

The number of fraudulent cases is a more complicated question. The sentencing court relied on the PSRs for the finding that the fraud involved more than 400 recruits. *See* Rainford PSR ¶ 24; Duncan PSR ¶ 24; Locust PSR ¶ 24 ("During the Fraud Scheme, more than 400 Patients were referred by LOCUST, DUNCAN, RAINFORD and their co-conspirators to the lawyers in order to initiate fraudulent cases.") (emphasis omitted). But that reliance was misplaced because the PSRs merely asserted—without reference to any admitted evidence—the claim of 400 fraudulent cases. Accordingly, the sentencing court's "adoption of the PSR does not suffice" because "the PSR itself does not state enough facts to permit meaningful appellate review." *Ware*, 577 F.3d at 452.

The question then is whether there are facts "sufficiently specific to permit meaningful appellate review" elsewhere in the PSR or that the district court recognized at the sentencing hearings. *Flores*, 945 F.3d at 721. We must consider whether the sentencing court erred when it concluded that those facts were established by a preponderance of the evidence. *See United States v. Thorn*, 317 F.3d 107, 117 (2d Cir. 2003). We proceed defendant by defendant.

**a**

Duncan "objected to the entirety" of his PSR on the ground that the Probation Office "solely adopted [facts] from whatever the

23

government said the facts were." Rainford App'x 1233. Although the government acknowledges that Duncan lodged a timely general objection to the PSR and concedes that we should review for clear error, Appellee's Br. 46, "[t]o preserve an objection for appellate review, a defendant must articulate it to the trial court 'with sufficient distinctness to alert the court to the nature of the claimed defect,'" *United States v. Dorvee*, 616 F.3d 174, 179 (2d Cir. 2010) (quoting *United States v. Gallerani*, 68 F.3d 611, 617 (2d Cir. 1995)). Duncan did not articulate an objection with distinctness; he did not alert the district court to the "nature" of his objection to the extent that he challenged the loss calculation for any particular reason. We therefore review for plain error. *See Verkhoglyad*, 516 F.3d at 128.

Duncan received a twenty-two-level loss enhancement on the ground that the intended loss from the schemes was about $30 million. *See* Duncan PSR ¶ 52. We resolve Duncan's challenge to the loss calculation based on the third prong of plain error review, prejudice. Assuming *arguendo* that the PSR's estimation that the Kalkanis scheme involved 400 cases was plainly erroneous, it would not have been erroneous had it estimated the number to be 300. That is because Kalkanis estimated that his scheme involved "[a]pproximately 300" cases. Rainford App'x 883, 1018. To be sure, Kalkanis testified inconsistently about the percentage of those cases that were fraudulent, starting with "[a]t least 80 percent," then "practically all," and finally "[t]he majority of them." *Id.* at 884. But even if we assume conservatively that only 50 percent of the cases were fraudulent, that would yield a total of 150 fraudulent cases. And in light of the district court's factual determination that each fraudulent accident had an intended loss of $100,000, Duncan's loss from the Kalkanis scheme would be $15,000,000.

24

That is just the Kalkanis scheme. Duncan also participated in a spin-off scheme that he conducted with Gordon. Duncan's PSR estimated that the spin-off scheme involved "at least 300 Patients," Duncan PSR ¶ 28, a fact on which the district court expressly relied, Rainford App'x 1340. The district court acknowledged that, although there was evidence that not all of these accidents were fraudulent, "it's still what I think amount to hundreds of accidents." *Id.* Even if the district court reduced the 300-accident figure by two-thirds, down to 100 accidents, and if each of those accidents had an intended loss of $100,000, that would generate an additional intended loss of $10 million.

That means—reading the evidence as to the number of fraudulent accidents in Duncan's favor as much as possible—there was a $15 million intended loss from the Kalkanis scheme and a $10 million intended loss from the spin-off scheme. That is $25 million, which is the threshold under § 2B1.1(b)(1)(L) for a twenty-two-level enhancement.

Given these conservative estimates, we conclude that any error did not prejudice Duncan's substantial rights. We affirm the judgment with respect to the twenty-two-level loss enhancement.

**b**

Locust specifically objected to his loss calculation, *id.* at 1280-81, which estimated a loss between $9.5 million and $25 million. We therefore review for clear error, but we conclude that the district court did not "make findings that are sufficiently specific to permit meaningful appellate review." *Flores*, 945 F.3d at 721. So we remand with instructions for the district court to make a factual finding as to the number of fraudulent accidents that the Kalkanis conspiracy orchestrated during Locust's involvement with the conspiracy.

Locust received a twenty-level loss enhancement. Locust objected to the loss calculation on the ground that it was not "based in evidence." Rainford App'x 1281. The district court simply "den[ied] the objection to loss amount" and "adopt[ed] the loss amount of between [$]9.5 and $25 million." *Id*. But the district court never made a factual finding; it said only that the range described in the PSR was "appropriate." *Id.* In other words, the district court never determined how many fraudulent accidents implicated Locust.

The district court's reliance on the PSR does not save the loss enhancement. The PSR said only that Locust "joined the scheme in 2015, and there were at least 200 Patients recruited into the scheme after LOCUST joined." Locust PSR ¶ 38 (emphasis omitted). The PSR cites no testimony or other admitted evidence supporting that figure.

In sum, the PSR did not state, the district court did not find, and we have located no statement in the record indicating that Locust participated in the conspiracy for a total of 200 cases. We cannot say whether that is a permissible or a clearly erroneous reading of the evidence. Accordingly, we remand for factfinding.

c

Rainford did not object to his loss calculation, so we review for plain error, as Rainford concedes we should on appeal. Rainford Br. 36. But we conclude that the district court again did not "make findings that are sufficiently specific to permit meaningful appellate review." *Flores*, 945 F.3d at 721. We therefore remand with instructions for the district court to make a factual finding as to the number of fraudulent accidents the Kalkanis conspiracy orchestrated during Rainford's involvement with the conspiracy.

Rainford received a twenty-two-level loss enhancement. Rainford PSR ¶ 51. Rainford's PSR explained the loss enhancement

26

by stating that "[t]he value of the intended loss was estimated in the amount of at least $30,000,000." *Id.* While the PSR acknowledged the $100,000 intended loss per fraudulent accident, *see id.* ¶ 43, the Rainford PSR never provided evidence for the number of fraudulent accidents touching the conspiracy during his tenure. The PSR offered three statements regarding the number of fraudulent accidents in which Rainford was involved. But each of those statements is insufficient to sustain the loss enhancement.

First, the Rainford PSR asserted that the Kalkanis conspiracy involved "more than 400 Patients," *id*. ¶ 24, but it did so without reference to evidence. We have located no evidence in the Rainford PSR, in the transcripts of the sentencing hearings, or in the record indicating that there were 400 cases orchestrated by the conspiracy while Rainford was a member.

Second, the PSR stated that "RAINFORD participated in the scheme from approximately 2012 through 2018, and there were at least 300 Patients recruited into the scheme during that time." *Id.* ¶ 43 (emphasis omitted). That appears to refer to the Kalkanis testimony. But the district court never determined the percentage of those 300 cases that were fraudulent. Moreover, Kalkanis testified inconsistently. As explained above, *see supra* Part II.A.2.a., Kalkanis indicated at one point that at least 50 percent of those cases were fraudulent. If so, then Rainford's intended loss would be $15 million.[7] That factual finding would support only a twenty-level loss enhancement, not a twenty-two-level loss enhancement. Accordingly,

---

[7] Kalkanis testified that there were approximately 300 cases and that the majority were fraudulent, leading to a total of at least 150 fraudulent cases. Because each fraudulent case had an intended loss of $100,000, the total intended loss would be at least $15 million.

the statement in the PSR that Rainford participated in the scheme for 300 cases is not sufficient to sustain the twenty-two-level loss enhancement.

Third, the PSR noted that Rainford "recruited patients" for the spin-off conspiracy, but it puts the number only at "at least two." Rainford PSR ¶ 41. That would not be enough to salvage the loss calculation.

Because (1) the PSR did not cite evidence for the statement that Rainford was involved in 400 cases and (2) neither the PSR nor the district court explained what percentage of cases was fraudulent, we remand with instructions to make sufficient findings of fact.

### d

In sum, we conclude that the district court's finding that the intended loss for each fraudulent accident was $100,000 was not clearly erroneous. We affirm the judgment with respect to Duncan's twenty-two-level loss enhancement. But we remand for factfinding regarding the number of fraudulent cases in which Locust and Rainford were involved. *See supra* note 4.

### B

The district court added a four-level enhancement to Duncan's guidelines calculation for his leadership role in the conspiracy. The guidelines state that a leadership enhancement is appropriate for an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a).

On appeal, Duncan argues correctly that the PSR and the district court did not make specific findings as to the five individuals involved in the spin-off scheme. *See* Duncan PSR ¶¶ 26-28. But he does not argue that the scheme was not "otherwise extensive." Nor

could he make such an argument. The PSR explained that Duncan's spin-off scheme lasted for three years, covered several hundred cases, and obtained over a million dollars in profit. That is extensive. For these reasons, we see no error in the district court's application of the four-level leadership enhancement.

## C

Duncan and Locust each argue that they should have received a guidelines reduction on account of minor or minimal participation in the Kalkanis conspiracy. We disagree.

The guidelines provide for a four-level decrease if the defendant was a "minimal participant" and a two-level decrease if the defendant was a "minor participant." For participants in between these categories, the guidelines provide for a three-level decrease. U.S.S.G. § 3B1.2. A "minimal participant" is one who had "lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others" and who is "plainly among the least culpable of those involved." *Id.* § 3B1.2, comment. (n.4). A "minor participant" is one who is "less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." *Id.* (n.5). The guidelines also explain that assessing whether a defendant was a minimal or a minor participant involves the consideration of five factors.[8]

---

[8] Those factors are "(i) the degree to which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the commission of the criminal

Locust argues that he was a minor participant and entitled to a two-level reduction. Locust Br. 49. Locust notes that the government "repeatedly conceded that Locust was the least culpable of the defendants who proceeded to trial." *Id.* at 50. Perhaps. But we have explained that the relevant inquiry is not whether a conspirator "played a lesser role than his co-conspirators" but whether a conspirator had a "'minor' or 'minimal' [role] as compared to the *average participant* in such a crime." *United States v. Carpenter*, 252 F.3d 230, 235 (2d Cir. 2001) (emphasis added) (quoting *United States v. Rahman*, 189 F.3d 88, 159 (2d Cir. 1999)). Locust fails to explain how his role in the Kalkanis conspiracy fits that description.

Duncan argues that he was a minimal participant and, in the alternative, that he was a minor participant. But the evidence suggested that Duncan was integral to the first scheme—that is, the Kalkanis scheme—for which he identified recruits, transported them to facilitate the scheme, referred doctors and lawyers, and so on. Duncan PSR ¶¶ 17-24. We are not persuaded that the district court erred in failing to reduce his guidelines calculation. Duncan's arguments focus on his culpability compared to his co-conspirators. As noted, however, the relevant inquiry is whether the conspirator's role was "'minor' or 'minimal' as compared to the average participant in such a crime." *Carpenter*, 252 F.3d at 235. The district court did not err in failing to apply a minor or minimal role reduction for either Duncan or Locust.

---

activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; [and] (v) the degree to which the defendant stood to benefit from the criminal activity." U.S.S.G. § 3B1.2, comment. (n.3(C)).

**D**

Rainford argues that the recruits to the scheme were co-conspirators rather than victims. *See* Rainford Br. 26. For that reason, he contends, the district court erroneously added three victim-related enhancements to each defendant's guidelines calculation: a vulnerable victim enhancement under U.S.S.G. § 3A1.1(b)(1); a ten-or-more victims enhancement under § 2B1.1(b)(2)(A)(i); and a risk of death or serious bodily injury enhancement under § 2B1.1(b)(16). We disagree.

**1**

Section 3A1.1(b)(1) provides for a two-level enhancement when "the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). The commentary clarifies that a vulnerable victim "is [1] a victim of the offense of conviction … who [2] is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." *Id.* § 3A1.1(b)(1), comment. (n.2). Rainford argues that it was a mistake to conclude that the "coconspirator[s] … qualified as 'victims.'" Rainford Br. 27.

This issue is controlled by *United States v. Borst*, 62 F.3d 43 (2d Cir. 1995). In that case, we considered a fraud scheme in which Borst "handle[d] all of the paperwork in obtaining loans" for several couples hoping to purchase mobile homes. *Id.* at 45. The documentation that Borst submitted to the bank "contained false statements regarding the year, model, purchase price, and serial number of the mobile homes." *Id.* On appeal, Borst contended that a vulnerable victim enhancement was improper.

We noted that at least one of the couples appeared to know that Borst entered fraudulent information on the loan application forms:

> Mrs. Russell noticed a discrepancy between the sales agreement Borst had prepared, which indicated that they were purchasing a 1988 Skyline mobile home, and the bank's promissory note, which stated that the mobile home was a 1992 model. Borst explained away the discrepancy as a means of expediting the transaction. Mrs. Russell later informed the probation officer that she accepted Borst's explanation and overlooked the discrepancy because her diabetic husband required constant medical care and they were temporarily homeless.

*Id.* The facts supported—and we recognized—that at least one of the borrowers knew of the fraud and inquired about it but was sufficiently vulnerable that she acquiesced rather than acting to "thwart" it. *Id.* at 46 (quoting *United States v. Kaye*, 23 F.3d 50, 54 (2d Cir. 1994)).

We then turned to the question most relevant to the present appeal: whether the "§ 3A1.1 enhancement was inappropriately applied because the three couples were not the actual victims of Borst's crimes." *Id.* at 47. We said that the couples were still victims for purposes of § 3A1.1 and announced a rule: "Whether or not the three couples … were 'unwitting instrumentalities' of Borst's criminal conduct in light of their apparent knowledge of Borst's misrepresentations to the bank, they were exploited and suffered harm as a result of his actions." *Id.* at 48. In other words, even if the couples *knew* that Borst was making fraudulent statements to banks and thereby acted as instrumentalities of the fraud, the couples were victims of Borst's scheme nonetheless.

That rule applies straightforwardly in our case. Regardless of whether the recruits in the slip-and-fall scheme knew of the fraud, "they were exploited and suffered harm as a result" of the fraud. *Id.*

As in *Borst*, these victims were exploited precisely because their economic vulnerability made them willing to engage in conduct that harmed them. The partial dissent argues that this case differs from *Borst* because the recruits were "knowing, willing, and voluntary, co-conspirators." *Post* at 8. But in both *Borst* and this case, the supposed victims knew of the fraud and willingly participated in it in the hope of obtaining a benefit. Yet they nevertheless were victims. The defendants "knew or should have known that these individuals were susceptible to [their] criminal conduct and less likely to thwart the crime." *Borst*, 62 F.3d at 46.

Even if we could distinguish *Borst* from this case, the § 3A1.1 enhancement still would properly apply. We begin with the text of § 3A1.1 and its commentary. *See Stinson*, 508 U.S. at 38; *see also supra* note 5. Section 3A1.1 does not define "victim," saying only that the defendant "knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). The commentary defines a "vulnerable victim" in part as someone "who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3." *Id.* § 3A1.1(b)(1), comment. (n.2). That does not provide a definition of "victim" either.[9]

---

[9] Apart from *Borst*, we have never precisely defined a "victim" for purposes of § 3A1.1. In *United States v. McCall*, we discussed "limits on the kinds of conduct that will justify a vulnerable victim enhancement." 174 F.3d 47, 50 (2d Cir. 1998). We identified three limits: (1) the "vulnerability of the victim must bear some nexus to the criminal conduct," (2) "the defendant generally must have singled out the vulnerable victims from a larger class of potential victims," and (3) "broad generalizations about victims based upon their membership in a class are disfavored where a very substantial portion of the class is not in fact particularly vulnerable to the crime in question." *Id.* The limits we identified concerned the victim's vulnerability rather than the status of being a victim in the first place.

As a matter of plain meaning, a victim is a "person harmed by a crime, tort, or other wrong." *Victim*, Black's Law Dictionary (11th ed. 2019). We think the dictionary definition of victim supports the conclusion that the recruits here were victims. A victim is a "person subjected to oppression, deprivation, or suffering," "someone tricked, duped, or subjected to hardship," or "someone badly used or taken advantage of." *Victim*, Webster's Third New International Dictionary (2002). The recruits were victims because the adverse burdens of the conspiracy fell on their shoulders—they were subjected to hardship by the doctors. The organizers of the conspiracy charged in this case, by contrast, were not. It is beyond dispute that some of the recruits were injured, and therefore endured a hardship, while the organizers were not. And the record indicates that the recruits were duped.[10] Even if they engaged in the scheme voluntarily, the organizers of the conspiracy took advantage of their economic vulnerability to lead them to undertake serious physical and legal risks.

---

[10] The record indicates, for example, that recruits were duped into borrowing high-interest loans from litigation funding companies that consequently collected large portions of any settlements. The litigation funding companies would underwrite the recruit's medical expenses, small personal loans to recruits, and referral fees, at interest rates between 25 and 50 percent. Recruits testified that their signatures had been forged on the loan agreements or that they were not aware that they had borrowed high-interest loans. *See, e.g.*, Rainford App'x 480 ("I don't know what it was that I signed. All I know, [Kalkanis] said it's to start the lawsuit."); *id.* at 526 ("No, I really didn't [read the papers], I just signed it. I just wanted to, you know, do whatever they told me to do to sign it up and that's it."); *id.* at 658 ("I called Bryan and told him I see my signature on some stuff that I took out loans for surgery and stuff and that's not my signature."); *id.* at 1095 ("[My mom] said somebody forged her signature and she got a loan out in her name and she didn't know anything about it.").

Moreover, the definition of "victim" used in § 2B1.1—though inapplicable to § 3A1.1[11]—suggests the scope of the term. Section 2B1.1 says that a victim is "any person who sustained any part of the actual loss determined under subsection (b)(1)" or "any individual who sustained bodily injury as a result of the offense." U.S.S.G. § 2B1.1, comment. (n.1). It does not mention voluntariness or willfulness at all. It does not exclude co-conspirators. Under this definition, the recruits were victims.

The partial dissent does not dispute that the plain meaning of "victim" includes co-conspirators.[12] But it argues that applying this plain meaning "would lead to absurd outcomes" in which "active and essential participants in a conspiracy could be considered victims." *Post* at 15. Not so. The plain meaning is consistent with the purpose of the guideline and results in no "genuine … absurdity" that would "justify departure from the plain text." *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 706 (2d Cir. 2019). The purpose of the sentencing enhancement is to account for conduct that is "more culpable than that of the typical perpetrator of that crime." *United States v. Morrill*, 984 F.2d 1136, 1137 (11th Cir. 1993). A defendant who commits an offense that causes harm to others—including others who are exploited as participants in the conspiracy—is more culpable than a defendant who commits the same offense without such harm to

---

[11] Application note 1 in the commentary to § 2B1.1, which provides several definitions including "victim," states at the very beginning that the definitions apply "[f]or purposes of *this* guideline." U.S.S.G. § 2B1.1, comment. (n.1) (emphasis added). As a result, the definition may be persuasive but it is not controlling for purposes of § 3A1.1.

[12] Rainford similarly acknowledges that a "literal reading," Rainford Br. 27, or a "broad reading," Rainford Reply Br. 10, of the guidelines would lead to that conclusion.

35

others. In this case, the defendants profited by recruiting economically desperate people to undergo unnecessary surgeries. Such conduct is more culpable than that of a defendant who, say, commits fraud by undergoing the unnecessary surgery himself.[13]

Our interpretation of the Mandatory Victims Restitution Act ("MVRA") supports this conclusion. As the partial dissent observes, "[u]nder the plain text of the MVRA … co-conspirators have just as much right to restitution as do innocent victims." *Post* at 20 (quoting *United States v. Lazarenko*, 624 F.3d 1247, 1250 (9th Cir. 2010)). We have departed from that plain-text reading because it would "require[] 'restitutionary' payments to the perpetrators of the offense of conviction," which would not make sense in the context of statute that aims to compensate the victims of a crime. *United States v. Reifler*, 446 F.3d 65, 127 (2d Cir. 2006); *see also Lazarenko*, 624 F.3d at 1251 ("Congress could not have intended that result. Otherwise, the federal courts would be involved in redistributing funds among wholly guilty co-conspirators, where one or more co-conspirators may have cheated their comrades."). But that context is absent here. While the MVRA aims at compensation, the sentencing

---

[13] The partial dissent argues that, if the Sentencing Commission intended for the enhancements to apply to co-conspirators, it would have expressly said so. *See post* at 18. It points to U.S.S.G. § 2D1.1, which provides for a sentencing enhancement when a defendant "distributed a controlled substance" to a vulnerable individual or otherwise "involved that individual in the offense." U.S.S.G. § 2D1.1(b)(16)(B). But § 2D1.1 imposes an enhancement for merely "involv[ing]" a vulnerable person in the offense without regard to whether that person was harmed, and therefore § 2D1.1 sweeps more broadly than a guideline that applies only to victims. We do not see why the Commission would have been expected to "use that same language if it wished to impose an adjustment" for conduct that *harmed* others. *Post* at 19.

enhancements aim at assigning culpability. Even the partial dissent acknowledges that the distinction makes a substantive difference in the reach of each provision.[14]

The partial dissent further suggests that under our purportedly "literal reading" of the application note, the term "victim" would include not only co-conspirators but also "a lone defendant … who suffered bodily harm as a result of his own offense." *Post* at 15. But here it is the partial dissent that is being unreasonably literalistic. At least in law, a person generally cannot be his own victim. A person does not commit a crime against himself or recover from himself in tort. *See Riggs v. Palmer*, 115 N.Y. 506, 511-12 (1889) ("[A]ll laws as well as all contracts may be controlled in their operation and effect by general, fundamental maxims of the common law. No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime. These maxims are dictated by public policy, have their foundation in universal law administered in all civilized countries, and have nowhere been superseded by statutes."); *Sieffer v. McLean*, 26 S.W. 315, 315 (Tex. Civ. App. 1894) ("The general rule may be found expressed in the maxim that no man can make his own misconduct the ground for an action in his own favor. If he suffers because of his own wrongdoing, the law will not relieve him.

---

[14] *See post* at 31 n.15 ("[T]he MVRA is intended to compensate victims, while sentencing enhancements for loss amount under the Guidelines are predicated on the notion that fraudsters who cause more monetary harm are more culpable and should therefore generally be given longer terms of imprisonment. As we have held, because a defendant's culpability will not always equal the victim's injury, an amount-of-loss calculation for purposes of sentencing does not always equal such a calculation for restitution.") (quoting *United States v. Niebuhr*, 456 F. App'x 36, 39 (2d Cir. 2012)).

The law cannot recognize equities as springing from a wrong, in favor of one concerned in committing it.") (quoting Thomas M. Cooley, A Treatise on the Law of Torts 167 (2d ed. 1888)); *see also People v. Latzman*, 395 N.W.2d 56, 58 (Mich. App. 1986) (explaining that the "definition of victim" under state sentencing guidelines "cannot be construed so as to include defendant as a victim of his own crime"). Given that legal background,[15] we do not agree that either § 3A1.1 or § 2B1.1 would include a defendant who suffered harm as a result of his own offense.

The remaining question is whether these victims were "vulnerable" within the meaning of § 3A1.1. We conclude that they were. The application note defines a vulnerable victim as a person "who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3" and who is "unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, comment. (n.2). The schemes in this case targeted the "down and out," including the homeless. Rainford App'x 1277. We have come close to saying that homelessness necessarily renders a victim vulnerable. *See United States v. Irving*, 554 F.3d 64, 75 (2d Cir. 2009) ("The facts that Irving's victims in Mexico and Honduras were children who were homeless and were without parental or other appropriate guidance made them unusually vulnerable, independently of their ages."). The recruits here were vulnerable too.

---

[15] *Cf. United States v. Scott*, 990 F.3d 94, 128 (2d Cir. 2021) (Menashi, J., concurring in part and concurring in the judgment) ("The ultimate objective is to determine the meaning the law assigns to the text and therefore its legal effect.").

38

We reject Rainford's arguments that the recruits were not victims within the meaning of § 3A1.1 because they were co-conspirators. We affirm the judgment with respect to the vulnerable victim enhancements.

**2**

Based on a similar argument, Rainford challenges the enhancement under § 2B1.1(b)(2)(A)(i), which provides for a two-level enhancement when the offense "involved 10 or more victims." U.S.S.G. § 2B1.1(b)(2)(A)(i). Rainford concedes that the nine insurance companies were victims, but he contends that the recruits were not victims because they were co-conspirators. *See* Rainford Br. 32. For that reason, he says, his crime did not implicate ten victims, so the § 2B1.1(b)(2)(A)(i) enhancement is inappropriate. We again disagree.

The application note explains that a victim is "any person who sustained any part of the actual loss determined under subsection (b)(1)" or anyone who "sustained bodily injury as a result of the offense." U.S.S.G. § 2B1.1, comment. (n.1). It further explains that "person" includes a natural person as well as a business entity. *Id.* The "loss determined under subsection (b)(1)" is a financial loss. *See id.* § 2B1.1, comment. (n.3(A)) (noting that "loss is the greater of actual loss or intended loss" and that "'[a]ctual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense"). It is undisputed that the nine insurance companies that submitted claims for restitution were victims within the meaning of § 2B1.1(b)(2)(A)(i).

In determining that the recruits were victims for purposes of § 2B1.1(b)(2)(A)(i), the district court applied the application note, which is subject to *Stinson* deference. We see no error in the district court's analysis. The guideline provision and the commentary "are to be read together" because "[n]o threshold test of ambiguity need be

39

passed before the commentary can be consulted." *Pedragh*, 225 F.3d at 244. Only when "the commentary contradict[s] the provision's text" does "the provision's plain language … control[]." *United States v. Lewis*, 93 F.3d 1075, 1080 (2d Cir. 1996). As discussed above, a straightforward application of the application note indicates that the recruits were victims: a victim is anyone who "sustained bodily injury as a result of the offense," and several of the recruits sustained such injuries. Accordingly, they are victims.

To reach the opposite conclusion, one must decide that the application note is a "plainly erroneous" interpretation of the guideline insofar as it understands the word "victim" to include co-conspirators. But for the reasons stated above, the word "victim" does not necessarily exclude co-conspirators. Moreover, we have previously applied the application note without issue. *See Lacey*, 699 F.3d at 716.

We conclude that at least one of the recruits was a victim, meaning there were ten or more victims implicated by the schemes. We affirm the judgment with respect to the enhancement under § 2B1.1(b)(2)(A)(i).

**3**

Rainford makes a similar challenge to a third victim-related enhancement: a two-level enhancement for committing an offense that involved the "conscious or reckless risk of death or serious bodily injury" under U.S.S.G. § 2B1.1(b)(16). Rainford argues that his conduct "did not risk or cause bodily injury to the insurance companies, the only victims here." Rainford Br. 31. He says that the recruits were willing participants who "put themselves at risk by agreeing to stage a slip-and-fall accident or to undergo surgery." *Id*.

40

That is incorrect. Section 2B1.1(b)(16) is not limited to nonparticipants. As the government points out, § 2K1.4(a)(1) already provides for an enhancement when the offense "created a substantial risk of death or serious bodily injury to any person *other than a participant in the offense*." Appellee's Br. 56. We do not understand § 2B1.1(b)(16) to be inapplicable when the person subject to the risk of injury was a participant, as the recruits were here. Their consent is immaterial.

Rainford does not say that the staged accidents or the surgeries did not contain a substantial risk of death or serious bodily injury. Unnecessary surgery is "the type of risk that is obvious to a reasonable person and for which disregard of said risk represents a gross deviation from what a reasonable person would do." *United States v. Lucien*, 347 F.3d 45, 56-57 (2d Cir. 2003). We affirm the judgment with respect to the two-level enhancement for risk of death or serious bodily injury.

## E

Duncan suggests in passing that the district court erred by applying a two-level enhancement for obstruction of justice. Duncan Br. 3. He does not offer an argument, however, so the issue is waived. *See United States v. Brennan*, 650 F.3d 65, 137 (2d Cir. 2011). Even so, the record contained evidence that Duncan pressured a co-conspirator to encourage his mother to state that her slip-and-fall claims were not fraudulent. *See* Supp. App'x 134 *et seq*. We see no reason to disturb the enhancement.

## III

Third, the defendants offer three challenges to their sentences apart from the guidelines calculations. Duncan argues that his

forfeiture order cannot be sustained. We agree, vacate the order, and remand for reconsideration. Rainford and Locust argue that their restitution order cannot be sustained. We disagree, but we modify the amount of the restitution order. Finally, Rainford argues that his term of imprisonment must be vacated because it is inconsistent with Duncan's and Locust's sentences. We affirm the judgment with respect to Rainford's sentence but remand for reconsideration in the interest of justice.

## A

The district court imposed a forfeiture order of $644,056 on Duncan for his involvement in the spin-off scheme. *See* Rainford App'x 1347.[16] On appeal, Duncan challenges that order as lacking an evidentiary basis and says that it violates the Excessive Fines Clause of the Eighth Amendment. We agree with his first argument and do not reach the Excessive Fines Clause claim.

"When a forfeiture award is challenged on appeal, this Court reviews the district court's legal conclusions *de novo* and its factual findings for clear error." *United States v. Treacy*, 639 F.3d 32, 47 (2d Cir. 2011). Because forfeiture is part of sentencing, a sentencing court must "determine forfeiture amounts by a preponderance of the evidence." *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007). Computing a forfeiture amount is not an "exact science." *Treacy*, 639 F.3d at 48. The district court must make only a "reasonable estimate of the loss, given the available information." *Uddin*, 551 F.3d at 180. It may "use general points of reference as a starting point for calculating the losses or gains from [the criminal activity] and may make reasonable

---

[16] The forfeiture order was joint and several with Gordon, Duncan's partner in D&G. Rainford App'x 1347.

extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding." *Treacy*, 639 F.3d at 48.

Some additional background is necessary to understand Duncan's argument. In 2020, when Duncan first appeared for sentencing, the government requested forfeiture of about $1.6 million. That figure represented the entire amount that Duncan's company, D&G, received in referral fees from when Duncan started the company in 2015 until his arrest in 2018. Duncan objected, and the district court adjourned for more time to decide the issue. When Duncan's sentencing resumed six months later, the government had reduced the request to $644,056.

At the hearing, the government stated that it had reduced the amount based on information from a "cooperating witness who's very familiar with the D&G's operation and its revenue." Rainford App'x 1332-33.[17] The government also represented that the notes from the Gordon interview were produced to Duncan's counsel. Rainford App'x 1333. Purportedly, Gordon had told the government that each entry in D&G's books would need to be analyzed to determine whether it was fraudulent. *Id*. But he had also said that, generally speaking, only about "40 percent of our cases were trip and falls and the rest were non[-]trip and falls. In total, around 80 percent of all cases were fraudulent, but of all the cases, 40 percent were related to trip-and-fall cases." *Id.*

The government argued to the district court that its forfeiture request did not need to be limited to trip-and-fall cases because "the indictment doesn't limit the allegations to trip and falls." *Id.* However,

---

[17] On appeal, the government notes that the witness was Gordon and that Duncan was aware at the time that Gordon was the cooperating witness. Appellee's Br. 78 n.18.

the government acknowledged that it did not introduce evidence at trial regarding any non-trip-and-fall cases, so it decided to "cut[] the 60 percent he estimated were non-trip-and-fall cases." *Id.* In other words, the government decided to confine the forfeiture request to the 40 percent of D&G's revenue that was attributable to slip-and-fall cases. The government observed that this was a conservative request because Gordon had also stated that the "trip-and-fall cases are funded easier … so the ledger is going to understate revenues for [those claims]." *Id.* In other words, even though slip-and-falls were only 40 percent of D&G's claims, slip-and-falls would compose more than 40 percent of D&G's revenue because it was easier to receive financing for those claims. For that reason, the government said, its forfeiture request "understate[d] considerably what the total amount of criminal proceeds would be." *Id.* at 1334.

In response, Duncan noted that several items on the ledger were from "entities that aren't even [litigation] funding companies," so the government was "just pulling numbers from everywhere." *Id.* at 1339.

The district court agreed with the government and imposed a restitution order in the amount of $644,056. *Id.* at 1347. After describing the spin-off scheme in detail, the district court said: "I do conclude that the government has proven the much-reduced figure of $644,000 by a preponderance of the evidence, which is a conservative estimate of the proceeds traceable to Duncan's criminal conduct." *Id.* at 1343. The district court acknowledged that Duncan had pointed to some entries in the ledger used to calculate the forfeiture amount that had nothing to do with the slip-and-fall scheme. But it concluded that "[w]ithout specific evidence showing that certain claims were fraudulent, his general challenge is unsuccessful" and the "significant reduction from 1.6 million down to 644,000, by a preponderance, …

does represent the proceeds Duncan derived from fraud scheme 2." *Id.* at 1344.

We vacate and remand the forfeiture order. The district court's determination was clearly erroneous for two reasons. First, the district court based its forfeiture order only on the representations of the government about Gordon's statements. The notes from the meeting were never presented to the district court, and Gordon never testified as to those figures. So the only evidence on which the district court relied to reach the $644,056 figure was the government's word. But the government's word is not evidence. True, the district court may take "general points of reference as a starting point for calculating the losses or gains," *Treacy*, 639 F.3d at 48, but an unsubstantiated government claim is not a "point[] of reference."

Second, even if the government's allegations about Gordon's statements had been corroborated, the government arrived at the forfeiture amount by crediting only part of Gordon's statement. The government reduced the forfeiture request by 60 percent because Gordon said that only 40 percent of D&G's cases were slip-and-falls. Yet the government entirely disregarded his other statement: that only 80 percent of all cases were fraudulent. Neither the government nor the district court has explained why the initial forfeiture request of $1.6 million should be cut by 60 percent but the resulting $644,000 should not be cut by another 20 percent to account for slip-and-fall claims that were not fraudulent.

For these reasons, we vacate the district court's forfeiture order and remand for reconsideration consistent with this opinion.

**B**

Rainford and Locust were ordered to pay approximately $3.9 million in restitution to defrauded insurance companies. They bear

45

that responsibility jointly and severally with Kalkanis, Gordon, and Dewitt. On appeal, Rainford argues that (1) the district court relied on incorrect loss numbers from several insurance companies, and (2) the district court used a faulty computation methodology. We disagree, so we affirm the order with a modification.

We review an order of restitution for abuse of discretion. *See United States v. Ojeikere*, 545 F.3d 220, 222 (2d Cir. 2008). Review of restitution orders is "extremely deferential," *United States v. Grant*, 235 F.3d 95, 99 (2d Cir. 2000) (quoting *United States v. Giwah*, 84 F.3d 109, 114 (2d Cir. 1996)), because "ordering restitution requires a delicate balance of diverse, sometimes incomparable, factors, some of which not only lack certainty but may indeed be based on mere probabilities, expectations, guesswork, even a hunch," *United States v. Rossi*, 592 F.3d 372, 376 (2d Cir. 2010) (internal quotation marks and alteration omitted).

The MVRA provides for mandatory restitution for offenses "committed by fraud or deceit" in which "an identifiable victim" has suffered "pecuniary loss." 18 U.S.C. § 3663A(c)(1). In each case, the district court orders restitution "in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." *Id.* § 3664(f)(1)(A). The "calculation of these losses need not be mathematically precise." *United States v. Rivernider*, 828 F.3d 91, 115 (2d Cir. 2016) (internal quotation marks omitted). The district court need make only a "reasonable estimate" of the loss "based on the evidence before it." *United States v. Milstein*, 481 F.3d 132, 137 (2d Cir. 2007).

Here, nine insurers submitted a total of thirty-eight claims for restitution, totaling about $4.9 million. The government sought to hold the defendants accountable for 80 percent of that figure because

Kalkanis stated that "[a]t least 80 percent" of the cases he managed were fraudulent. Rainford App'x 883-84. That yields the figure of $3.9 million.

Rainford makes two arguments, both of which concern minor errors. First, he says that two claims by insurance companies used to compute the restitution amount were incorrect. Rainford suggests that one of the AmTrust claims is off by $2,500. Rainford Br. 44. But the figure on which the government relied is substantiated elsewhere in a sealed portion of the record. Rainford also suggests that a Hartford claim for $30,000 was erroneously included. He argues that the claim should not have been included because Hartford's own records list the claim as open. Because listing the claim as "open" and unpaid may have been an administrative mistake by Hartford, we are not "left with the definite and firm conviction that a mistake has been committed" by the district court. *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). We see no clear error and thus no abuse of discretion. *See Garcia v. Garland*, 64 F.4th 62, 69 (2d Cir. 2023) (explaining that a decision that rests on a "clearly erroneous factual finding" or that "cannot be located within the range of permissible decisions" constitutes an abuse of discretion) (quoting *Morgan v. Gonzales*, 445 F.3d 549, 551-52 (2d Cir. 2006)).

Second, Rainford and Locust contend that there was no evidence that the claims were in fact fraudulent. Rainford Br. 45; Locust Br. 43. For that reason, they say that the district court should have evaluated each claim by an insurance company to determine whether it was fraudulent. The district court adopted a different method. It credited Kalkanis's testimony that 80 percent of the cases he managed were fraudulent. The district court thereby treated all the claims as fraudulent but applied a 20 percent reduction to the total in

47

recognition of Kalkanis's statement. Because restitution may be based on "guesswork" or "even a 'hunch,'" *Rossi*, 592 F.3d at 376 (quoting *United States v. Atkinson*, 788 F.2d 900, 902 (2d Cir. 1986)), we do not think the district court's methodology relied on clearly erroneous facts or that it "cannot be located within the range of permissible decisions" such that it would amount to an abuse of discretion. *Garcia*, 69 F.4th at 69.

There is, however, one flaw in the restitution order. The government concedes that one of the thirty-eight claims by an insurance company was not related to a fraudulent accident. The claim was submitted to the insurance company by Alvin Martin, and Martin testified at trial that the claim was legitimate. Rainford App'x 1221. That claim settled for $150,000. Because of the 20 percent reduction on account of Kalkanis's testimony, Martin's claim contributed only $120,000 to the restitution order. The government therefore recognizes that it would be appropriate either to vacate and remand to correct this issue or to affirm the judgment with a modification. Appellee's Br. 74 & n.16. We affirm the restitution order but reduce it by $120,000.

## C

Finally, Rainford argues that we should remand his term of imprisonment for reconsideration in the interest of justice pursuant to 28 U.S.C. § 2106. That statute permits us to "affirm, modify, vacate, set aside or reverse any judgment, decree, or order … and … remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances." 28 U.S.C. § 2106; *see also United States v. Jones*, 878 F.3d 10, 24 n.6 (2d Cir. 2017) (Calabresi, J., concurring) (noting that "28 U.S.C. § 2106 permits affirmances and remands for

further proceedings in the interest of justice, and has been applied in criminal situations"). We are persuaded by Rainford's arguments. Accordingly, we affirm his sentence but remand for reconsideration "as may be just under the circumstances."

Some background is necessary to understand Rainford's claim. The first sentencing hearing in this case occurred on January 7, 2020. At that hearing, the district court sentenced Duncan to 80 months of imprisonment, but it reserved judgment on forfeiture. Rainford App'x 1260, 1262. It sentenced Rainford to 68 months of imprisonment, but it reserved judgment on restitution. *Id.* at 1316-18. And it sentenced Locust to 60 months of imprisonment, but it reserved judgment on restitution. *Id.* at 1289-92.

Duncan's forfeiture amount was determined at a hearing on July 27, 2020. As noted above, *supra* Part III.A., the government conceded at that hearing that a significant percentage of the proceeds from the spin-off scheme were not fraudulent, so it reduced the requested forfeiture amount. Rainford App'x 1333. After concluding that the spin-off scheme involved fewer fraudulent cases than originally thought, the district court reduced the forfeiture amount and also "decrease[d] the sentence of Mr. Duncan from 80 months to 72 months." *Id.* at 1340.

Locust's restitution hearing was held about a year later on July 9, 2021. The district court recalled that it had lowered Duncan's sentence on account of the government's concession that the spin-off scheme involved non-fraudulent claims. *See id.* at 1375 ("[M]y intention at this point is I need to take into consideration the change in Duncan so that the people are comparable for everything, with each other and in between each other."). In light of Duncan's reduced

49

sentence, the district court found it "more appropriate" that Locust's sentence be "48 months rather than 60," so it made that reduction. *Id.*

Rainford's sentence has not been reconsidered. That appears to be inconsistent with the district court's other decisions. The district court sentenced all three defendants on the same day in January 2020 in proportion to their relative culpability. It later reduced Duncan's sentence in light of new information regarding the spin-off scheme. It then reduced Locust's sentence in light of Duncan's reduction—even though Locust was not involved in the spin-off scheme. But Rainford has not had his sentence reconsidered in light of the Duncan and Locust reductions. This result is perplexing because Rainford—unlike Locust—*was* involved in the spin-off scheme. Rainford PSR ¶ 41. Thus, Rainford's case for a reduction based on Duncan's reduction would be stronger than Locust's—but only Locust received a sentence reduction. True, the defendants' current sentences align with their levels of culpability: Duncan at 72 months, Rainford at 68 months, and Locust at 48 months. But on these facts, we remand for the district court to consider whether it wants to adjust Rainford's sentence as it did for the other two defendants.

The government argues that we should not do so, saying that Rainford's reliance on *United States v. Jones* is misplaced. We disagree. In *Jones*, we affirmed a sentence but remanded for reconsideration pursuant to § 2106. *See* 878 F.3d at 13. The government says that *Jones* is inapplicable because Jones received a "very, very high sentence in contrast with almost every similarly situated defendant" as a result of "timing quirks" and that no similar facts are present here. Appellee's Br. 67-68 (quoting *Jones*, 878 F.3d at 24 (Calabresi, J., concurring)). But these are similar facts. Rainford received a higher sentence relative to his codefendants as a result of timing quirks—because the district court had a chance to reconsider Locust's sentence, but not Rainford's

50

sentence, following its reconsideration of Duncan's sentence. Remand is warranted because of the district court's stated intention to adjust the sentences in accordance with the defendants' relative culpability, though the district court is not required to make any adjustment if it determines that the sentences are warranted.

We affirm Rainford's sentence but remand for reconsideration "as may be just under the circumstances." 28 U.S.C. § 2106.

## CONCLUSION

We affirm the judgment of the district court except as follows. We affirm the judgment with respect to Rainford's and Locust's guidelines calculations but remand to the district court for factfinding as to the number of fraudulent accidents that were orchestrated by the scheme during Rainford's and Locust's tenures for the purpose of computing the loss enhancement. We vacate Duncan's forfeiture order and remand for further proceedings consistent with this opinion. We affirm Rainford and Locust's restitution order but reduce the amount of restitution by $120,000. And we affirm Rainford's sentence but remand for reconsideration under 28 U.S.C. § 2106.

In light of the *Jacobson* remand on the issue of the loss enhancement, *see supra* note 4, upon the district court's issuance of a new order, any party may restore the matter to the active docket of this court by letter without filing a notice of appeal. If further action is sought from this court, the matter will be referred to this panel.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

51